Warren V. Johnson
warrenvjohnson@gmail.com
215 E 18th St
Lawrence, KS 66044

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Mr. Warren Vurl Johnson,
Plaintiff,

*v.*

Early Warning Services, LLC,
Defednant

Case No. 1:26-cv-00441

**SECOND AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT, UNJUST ENRICHMENT, AND VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT**

## INTRODUCTION

Plaintiff Warren V. Johnson ("Johnson"), for his Complaint against EWS Early Warning Services, LLC ("EWS"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action for copyright infringement and violation of the Digital Millennium Copyright Act. EWS Early Warning Services, LLC ("EWS")—a sophisticated financial services company—is daily reproducing and using proprietary software code it does not own and has admitted it does not own. EWS has never needed access to Johnson's protected source code to retrieve its own data. For nine years, EWS employees had full

access to a "read-only" version of the Copyrighted Works that displayed all data inputs and outputs. To extract its data without touching Johnson's code, an EWS employee needed only three standard Excel commands: copy, new tab, paste values—preserving all formatting and data while leaving behind no copyrighted expression.

2. EWS chose not to do this. Instead, after Johnson's employment ended, EWS's Senior Intellectual Property Counsel used a password—provided only for training—to circumvent the technological protections Johnson had placed on his code, granting EWS unauthorized access to modify and use the protected material itself. EWS continues this unauthorized use today, without license or compensation to Johnson, the sole copyright owner.

3. The parties settled all employment-related disputes in August 2023, with a settlement agreement that only waived claims "as of the date of signing this Agreement" (Ex. A at §5) *and explicitly preserved* "claims that may arise after Johnson signs this Agreement." (Ex. A at §6)

4. EWS has recently admitted in federal appellate filings that it does not claim ownership or trade secret protection over the "templated Indices" (the rows, columns, headings, and proprietary formulas). Nor could they since

5. This action concerns EWS's independent and intentional conduct since EWS filed the complaint in that case, **June 28, 2024**, the conduct remains ongoing today, **eliminating any compulsory counterclaim or claim splitting defense as a matter of law.**

6. Despite disclaiming a proprietary interest in the Copyrighted Works, EWS's current Senior Intellectual Property Counsel has admitted under oath that the Copyrighted Works remain "indispensable" to EWS's daily operations. EWS continues to reproduce and use

Johnson's Copyrighted Works without his authorization or compensation, and has done so only by circumventing the technological measures and system Johnson put in place to protect them.

7. Substantiating EWS's lack of proprietary interest in the Copyrighted Works is Johnson's Employment Agreement—which was an Agreement Johnson took ownership over for the 9 years he worked at EWS and redrafted on more than one occasion—expressly denied EWS authorization to access his source code by requiring a license grant for any IP listed in Attachment A of the Agreement, where Plaintiff wrote "NONE," thereby satisfying the DMCA's "without authority" element as a matter of law. (Ex. B)

8. EWS's conduct constitutes the unauthorized circumvention and reproduction of Johnson's **copyrighted computer program**—specifically, the underlying source code and functional logic that Johnson created in 2014. While the spreadsheet interface may house EWS's data, the code that processes that data is an independent work of authorship. EWS has admitted it does not claim ownership of this 'vessel', yet it chose to bypass technological protections to access the code itself rather than simply utilizing the results provided via SharePoint.

9. **<u>PARTIES</u>**

10. Plaintiff Warren V. Johnson is an individual residing in Lawrence, Kansas. He is the creator and sole author of the copyrighted Indexes.

11. EWS Early Warning Services, LLC ("EWS") is a Delaware limited liability company with its principal place of business in Scottsdale, Arizona. EWS maintains an office and employs personnel, including its Senior Intellectual Property Counsel, Paras Shah, in Chicago, Illinois, within this Judicial District.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 et seq.

13. Venue is proper in this District under 28 U.S.C. § 1400(a) and 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred here. Specifically, EWS's agent, Paras Shah, uses, maintains, and populates the infringing Indexes from his office in this District, and executed the sworn declaration admitting to such use in Chicago, Illinois.

14. This Court has personal jurisdiction over EWS because it regularly conducts business and employs individuals who commit the tortious acts at issue within this District.

## FACTUAL ALLEGATIONS

**A. Creation and Ownership of the Indexes.**

15. Years before his employment with EWS, between 2010 and 2012, Johnson conceived, created, and authored source code that acted as a suite of sophisticated Microsoft Excel-based intellectual property management frameworks, "Copyrighted Works."

16. The Copyrighted Works are original works of authorship comprising Johnson's unique selection, coordination, and arrangement of data fields, proprietary formulas, algorithms, and analytical frameworks.

17. Johnson brought these fully formed Copyrighted Works with him to EWS in 2014 as his pre-existing personal property. (**Ex. H – Template email from September 9, 2014, Johnson's second day on the job**)

18. The United States Copyright Office has issued registrations for these works giving Johnson the strong presumption of ownership and validity in the Copyrighted Works.

**B. The August 2023 Settlement Agreement**

19. In August 2023, Johnson and EWS executed a settlement agreement.

20. Section 5 of that agreement was negotiated to *expressly waive only* claims Johnson may have had against EWS "as of the date of signing the Agreement." (Ex. A – *Excerpt from Settlement Agreement* (emphasis added)).

21. To be sure, Johnson negotiated Section 6 of that agreement to *expressly preserved* "claims that may arise after Johnson signs this Agreement." *Id.*

22. By operation of Section 5 and 6 of the Settlement Agreement, Plaintiff expressly reserved the right to bring claims arising after August 2023 and limited the Settlement to only those claims at the time of execution. The copyright infringement and DMCA violations alleged herein—based on conduct occurring **after June 28, 2024**—fall squarely within that reservation and therefore cannot be alleged to be compulsory counter claims or claim splitting as a matter of law. **This is a bright line rule.**

23. EWS cannot argue waiver or release where the governing agreement explicitly preserves future claims.

24. This action concerns EWS's conduct after **June 28, 2024**—specifically, its decision to retain, reproduce, circumvent protective measures, and continue using Johnson's Copyrighted Works without a license and to circumvent technological measures to gain unauthorized access to the Copyrighted Works.

**C. EWS's Admissions of Post-Settlement Use**

25. On June 28, 2024, EWS filed a lawsuit against Johnson in the District of Arizona (Case No. CV-24-01587) ("AZ Action") wherein EWS accused Johnson of misappropriating his own Copyrighted Works. This is when Johnson discovered EWS's continued use of his Copyrighted Works.

26. In the AZ Action EWS claimed Johnson's Copyrighted Works were EWS trade secrets for the first time. Prior to the AZ Action EWS had never made a claim to Johnson's Copyrighted Works.

27. The present action concerns only EWS's infringing conduct, and circumvention of technological protections to gain unauthorized access that occurred on or after **June 28, 2024**—conduct that is separate and independent from any pre-suit disputes making compulsory counterclaims or claim splitting defenses moot under the law.

28. Plaintiff brings this action for EWS's unauthorized reproduction, use, and access of and to the Copyrighted Works occurring on **or after June 28, 2024**. Under well-settled law, including *Smith v. Potter*, 513 F.3d 781, 783–84 (7th Cir. 2008) ("[r]es judicata does not bar a suit based on claims that accrue after a previous suit was filed") and *Heard v. Tilden*, 809 F. 3d 974 (7th Cir. 2016) ("The doctrine of "claim preclusion generally does not bar a subsequent lawsuit for issues that arise after the operative complaint is filed" in the first lawsuit"), claims arising from conduct occurring after the filing of a prior complaint are **not barred by res judicata, even if they involve similar subject matter and nucleus of facts**. Plaintiff expressly disclaims any claim for relief based on conduct predating **June 28, 2024**.

29. EWS has admitted in recent judicial filings that it continues to use Johnson's property to this day. (See **Ex. B – Excerpts from Shah Dec.** and **C – Excerpts from Appeal Brief**)

30. In an August 15, 2024, declaration executed in this District, EWS's Senior Intellectual Property Counsel, Paras Shah, admitted that the Indexes are " give EWS a competitive advantage in the competitive financial services field" and are essential for EWS to develop, harvest, acquire, and enforce its intellectual property." (**Ex. B**)

31. Mr. Shah further admitted that his job duties include "populating these indices" and "maintaining them," and that EWS "continues to make these investments... to this day". *Id.*

32. In subsequent appellate filings, EWS has explicitly distinguished between the underlying [public] data it claims to own and the "templated Indices" (the Copyrighted Works) created by Johnson. (**Ex. C**)

33. EWS admitted it "does not claim the templated Indices (i.e., the rows, columns, headings, standard formulas, and conditional rules and formatting) are trade secrets," yet it continues to use these Copyrighted Works it knows are owned by its former employee to "house and present" its data without Johnson's authorization. *Id.*

34. This continued, unauthorized use of Johnson's copyrighted expression, and unauthorized access of the Copyrighted Works constitutes new and independent series of infringements occurring after the parties' August 2023 settlement, and continues on after the **June 28, 2024,** date of EWS's Complaint.

35. Plaintiff is the sole owner of the valid and subsisting United States Copyright Registrations for the proprietary software tools (collectively, the "Copyrighted Works"). (**Exhibit E – Registration Certificates**) These include:

    1. Reg. No. TXu002519256 ('Invention Disclosure Management System'), effective December 30, 2025; and

2. Reg. No. TXu002520557 ('Intellectual Property General Matter Management System'), effective January 9, 2026.

36. Complete and accurate copies of the registration certificates for each Copyrighted Works are attached to this Second Amended Complaint (**Ex. E**).

37. These registrations constitute prima facie evidence of the validity of the copyrights pursuant to 17 U.S.C. § 410(c), and Johnson's ownership thereof.

38. EWS's infringing conduct began well before these effective registration dates and has continued without interruption thereafter. Upon information and belief, EWS has reproduced, populated, maintained, and used Copyrighted Works on multiple occasions after December 30, 2025. Johnson is therefore entitled to seek all remedies available under 17 U.S.C. § 504, including actual damages, EWS's profits attributable to the infringement, and, for post-registration conduct, statutory damages.

**D. Johnson's Technological Protection Measures**

39. Johnson was Senior Intellectual Property Counsel at EWS and personally took ownership of, and repeatedly revised the Employment Agreement (**Ex. F – Annotated Excerpts of Employment Agreement**). Johnson knows its structure, provisions, its flaws, and its intended operation—including the deliberate choice to write 'NONE' in Attachment A, which granted EWS no license to his pre-existing copyrighted works.

40. A true and correct copy of the relevant pages of EWS's Employment Agreement, with annotations clarifying its operation, is attached as **Exhibit F**. As the agreement shows, it is structed with purpose, and not arbitrarily. Pargraph 1 is the future assignment of inventions that are created after being hired, importantly it is a *future assignment. Id.*

Paragraph 2 is only given meaning when Paragraph 1 is read this way, because Paragraph 2 is the perfection of the future assignments. Standard for inventions and patents.

41. Then, the next one, Paragraph 3, shifts focus to licensing "Background IP" that an employee may bring with them and *that is related to the business of the Company*. Paragraph 3 does this by having employees list Background IP to which EWS will be granted a license in Attachment A.

42. The comma after the parenthetical in Paragraph 3 makes listing Background IP in Attachment A the condition precedent to EWS getting a license to that Background IP. This is consistent with Delaware law regarding employment contracts and employee assignment of Background IP.

43. **Johnson recognized the comma** after the parenthetical and recognized the implication of the Attachment in view of the Background IP licensing context. The drafting of the Agreement is such that close inspection is needed to recognize that any IP listed in the Attachment and **related to the business of the Company** will be licensed to Company. **This is in fact the only grammatically proper way to read this document.**

44. The inclusion of "none" in the Attachment is an express denial of any license or authorization to access any IP Johnson may have brought, *if related to the business of the Company.*

45. To protect the Indexes from unauthorized access and modification, Johnson implemented a two-tier access control system while working at EWS:

    a. **Read-Only Mode:** Users that were granted access to Johnson's SharePoint site, by Johnson, could view only the *outputs* and *inputs* of the Indexes. The protected expressive elements remain inaccessible and hidden from view.

    b. **Modify Mode:** User, only one had this access, was granted access to Johnson's SharePoint site, and were allowed to view, use, or alter the source code, formulas, and structure of the Copyrighted Works by using a unique "Password to Modify" within Excel, coupled with the appropriate authorization in SharePoint. *Johnson maintained control over both and decided access rights.*

46. The "Password to Modify" and SharePoint permission layers functioned together as a single, integrated technological measure. In the ordinary course of its operation, this system required the application of specific information (the password) and authorization (SharePoint permissions) to gain access to the copyrighted work.

47. Johnson's implementation of this two-tier system was a deliberate and custom authorization structure, designed specifically to control access to the expressive elements of his Copyrighted Works.

48. EWS has previously asserted, in this litigation and related proceedings, that the "Password to Modify" and associated access controls constituted the "reasonable measures" required to maintain the data in the Copyrighted Tools as trade secrets and were critical to the protection of this proprietary information

49. EWS is judicially estopped from denying that the password and permissions were technological measures designed to restrict access to this valuable intellectual property.

50. On or about the termination of Johnson's employment, *the only employee of EWS that had knowledge of Johnson's key/password to the source code* ("Mr. Shah") used the "Password to Modify" and his SharePoint permissions to access the Copyrighted Works

in modify mode. This access was without authorization from Johnson, the sole copyright owner.

51. Johnson had hired Mr. Shah himself and provided him the Password to Modify for training purposes. *No other employee knows the Password to Modify*.

52. By using the password and permissions to bypass the two-tier system, Mr. Shah gained access to the formulas, logic, and structure of the Copyrighted Works—the very elements that were locked and unavailable in read-only mode. This constitutes circumvention of a technological measure that effectively controls access to a work protected under Title 17.

## COUNT I: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)

53. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

54. Plaintiff is the sole owner of valid copyrights in the Copyrighted Works.

55. EWS has admitted that these Copyrighted Works—the rows, columns, headings, and proprietary formulas—are not its trade secrets.

56. Despite this admission, EWS has continued to reproduce, distribute, and create derivative works based upon the Copyrighted Works without Plaintiff's authorization.

57. EWS's infringement of the Copyrighted Works is willful. EWS has full knowledge of Johnson's authorship, has been put on notice of his claims, and continues its unauthorized use in reckless disregard of his copyrights.

58. This unauthorized use of the Copyrighted Works constitutes a series of new, independent acts of infringement that began after the parties settled their prior employment-related disputes and continued unabated after EWS filed suit against Plaintiff on June 28, 2024. This action concerns only the post-June 28, 2024 conduct.

59. EWS's infringement has been and continues to be willful. EWS has admitted in sworn declarations and court filings that Plaintiff's Copyrighted Works are "indispensable" and "critical" to its ability to compete.

60. Admitted Value: In a Declaration filed August 15, 2024, EWS's Senior IP Counsel, Paras Shah, admitted that the Indices (the Copyrighted Works) are necessary to "track the development, harvesting, acquisition, and enforcement of EWS's intellectual property rights."

61. Admitted Competitive Necessity: In filings before the Ninth Circuit (Case 24-7315), EWS admitted the Copyrighted Works contain "proprietary data vital to EWS's patent and trademark strategies" and that "maintaining the secrecy of EWS's indices is critical to EWS's ability to effectively develop, harvest, acquire, and enforce its intellectual property."

62. Pursuant to 17 U.S.C. § 504(b), Plaintiff is entitled to recover any profits of the EWS that are attributable to the infringement. Because EWS has admitted these tools are "vital" to its core business strategy and IP enforcement—which protects its market share—Plaintiff alleges that a portion of EWS's revenues and operational efficiencies are directly attributable to the use of Plaintiff's proprietary software.

63. As a direct result of EWS's infringement, Plaintiff has suffered damages.

## COUNT II: UNJUST ENRICHMENT

64. Johnson incorporates the preceding paragraphs as if fully set forth herein.

67. Following the August 2023 settlement, EWS knowingly obtained and retained a significant benefit through the continued, unauthorized use of Plaintiff's Copyrighted Works.

68. EWS has explicitly admitted in judicial filings that it does not claim ownership or trade secret protection over the "templated Indices" created by Johnson.

69. Despite admitting it has no proprietary claim, EWS's own counsel has admitted under oath that the "Tools" are "indispensable" to EWS's operations, as it continues to "populate," "maintain," and "make investments" in using these frameworks.

70. EWS's own admissions establish the immense value it derives from the Indexes.

71. It would be inequitable and unjust for EWS to retain the benefit of these "indispensable" Copyrighted Works without paying their reasonable value to Johnson, as this use occurs entirely outside the scope of the parties' settled employment relationship.

## COUNT III: VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201)

72. Johnson incorporates the preceding paragraphs as if fully set forth herein.

73. The two-tier access system Johnson implemented—requiring a "Password to Modify" and proper SharePoint permissions to access the formulas, logic, and structure of the Indexes—is a technological measure that, in its ordinary operation, effectively controls access to a copyrighted work.

74. On or after the termination of Johnson's employment, EWS, through Mr. Shah, circumvented this technological measure by using the password and permissions to access the Copyrighted Work in modify mode without authority from Johnson, the copyright owner.

75. At the time of the circumvention, Mr. Shah and EWS knew, or should have known, that access to modify mode was restricted and that they lacked authorization from the copyright owner.

76. This circumvention granted EWS access to the protected expressive elements of the Copyrighted Works—the formulas, structure, and logic—which were otherwise inaccessible in read-only mode.

77. By its conduct, EWS violated 17 U.S.C. § 1201(a)(1), which prohibits the circumvention of a technological measure that effectively controls access to a work protected under Title 17.

78. Johnson has consistently maintained, including in prior judicial proceedings, that the password and permissions were critical protections for his proprietary information. EWS is judicially estopped from denying that these measures were designed to, and did, effectively control access to the copyrighted work.

79. As a direct and proximate result of EWS's violation, Johnson has suffered and continues to suffer harm, including loss of control over his work and unauthorized access to and use of its most valuable elements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Warren V. Johnson respectfully requests that the Court enter judgment in his favor and against Defendant Early Warning Services, LLC, as follows:

a. A declaration that EWS has infringed Plaintiff's valid Copyright Reg. No. TXu002519256 and Reg. No. TXu002520557;

b. A declaration that EWS has violated the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(1);

c. An order permanently enjoining EWS from using, copying, or displaying Plaintiff's software tools, and from further circumventing the technological measures protecting the Indexes;

d.  An award of actual damages and disgorgement of EWS's profits attributable to the copyright infringement pursuant to 17 U.S.C. § 504(b);

e.  Statutory damages for copyright infringement, to the extent available for post-registration conduct;

f.  Statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) for each act of circumvention, in an amount not less than $200 and not more than $2,500 per act, as the Court considers just;

g.  An award of restitution for unjust enrichment in an amount equal to the value of the benefits EWS has unjustly retained;

h.  An award of reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and 17 U.S.C. § 1203(b)(5);

i.  Pre- and post-judgment interest; and

j.  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: March 2, 2026

/s/ Warren V. Johnson
Warren V. Johnson
215 E 18th St
Lawrence, KS 66046
Tel: (208) 317-1686
Email: warrenvjohnson@gmail.com
*Pro Se Plaintiff*

# EXHIBIT A

## [ANNOTATED]

## <u>CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT</u>

Warren Johnson ("Johnson") and Early Warning Services, LLC (the "Company") (collectively, the "Parties" and individually, a "Party") enter into this Confidential Settlement and Release Agreement ("Agreement") to resolve all of Johnson's demands, disputes and claims arising out of his employment with the Company, including, but not limited to, those that have been or could have been asserted in Case No. CV2023-010955 filed in the Superior Court for Maricopa County, Arizona (collectively, the "Litigation"). Accordingly, the Parties agree to the following terms:

1.     **<u>No Admission of Liability or Wrongful Conduct</u>**.  The Company expressly denies Johnson's claims, including, but not limited to, those that have been or could have been asserted in the Litigation, and denies any wrongdoing or liability arising out of Johnson's employment with the Company. Neither the fact of this Agreement nor any of its parts shall be construed as an admission of wrongdoing, liability, or that any fact or allegation asserted by either Party was true.

2.     **<u>Payment by the Company</u>.**  In consideration for the promises Johnson has made in this Agreement, the Company agrees to pay Johnson the total gross sum of $91,666 (the "Settlement Payment"). The Company will issue an IRS Form 1099 MISC to Johnson reflecting the Settlement Payment, as required by law. Johnson will be solely responsible for paying any amounts due to any governmental taxing authority as a result of the Settlement Payment. Johnson acknowledges and agrees that he is solely responsible for paying any attorneys' fees and costs that he has incurred in conjunction with the Litigation and that Johnson will not seek any award of attorneys' fees or costs from the Company.

The Company will send the Settlement Payment to Johnson within fourteen (14) calendar days after the following have all occurred: (i) the Company receives an executed copy of this Agreement by Johnson with a W-9 form completed by Johnson; (ii) Johnson has taken the necessary actions to withdraw and effectuate the dismissal and termination of the Litigation with prejudice and without costs or fees to either Party; and (iii) the Court has issued an order approving the withdrawal and/or dismissing the Litigation in its entirety, with prejudice.

3.     **<u>Outplacement Services</u>**. The Company agrees to pay Lee Hecht Harrison ("LHH"), a third-party vendor, to provide Johnson with LHH's Professional Program outplacement services for three (3) months following the effective date of this Agreement consistent with the information attached as Exhibit A to this Agreement ("Outplacement Services"). The Company will make arrangements with LHH to invoice the Company directly for the costs associated with the Outplacement Services. Except for payment, Johnson will be responsible for communicating, coordinating and working directly with LHH with respect to all other aspects of the Outplacement Services. The Company's obligations under this Section 3 will be fully satisfied and discharged once the Company pays LHH for the Outplacement Services, at which point the Company will have no further obligations under this Section 3.

4.     **<u>Withdrawal and Dismissal of the Litigation</u>.**  Johnson agrees to take all necessary actions to withdraw and effectuate the dismissal and termination of the Litigation with prejudice and without costs or fees to the Parties. Johnson also agrees that he will not seek any costs or fees in conjunction with any filings necessary to withdraw and/or dismiss the Litigation.

5.     **<u>General Release of Claims by Johnson</u>.**  In exchange for the Settlement Payment and Outplacement Services, Johnson**,** on behalf of himself, his marital community, heirs, and assigns

(if any), release, knowingly and willingly, the Company, the Company's owners, and their respective subsidiary, parent, predecessor and successor corporations and entities, and their past and present officers, directors, agents, insurers, attorneys, and employees, and the Company's employee benefit plans and programs and their administrators and fiduciaries (collectively referred to as the "Released Parties") from any kind of claim Johnson has against the Released Parties. This general and complete release applies to all demands, disputes, complaints, causes of action, and claims, known and unknown for relief, that Johnson may have against the Released Parties as of the date of execution of the Agreement. This release of claims includes, but is not limited to any claims under: federal, state or local employment, wage, labor, civil rights, equal pay, or anti-discrimination laws, statutes, case law, regulations, and ordinances; federal or state Constitutions; any public policy, contract, tort or common law theory; and any statutory or common law principle allowing for the recovery of damages, compensation, fees or other expenses, including attorneys' fees. The claims that Johnson is releasing include, but are not limited to, claims under the following laws (as amended): Family and Medical Leave Act; Title VII of the Civil Rights Act of 1964; Civil Rights Act of 1991; Sections 1981 through 1988 of Title 42 of the United States Code; Equal Pay Act; Employee Retirement Income Security Act of 1974; Americans with Disabilities Act; Fair Credit Reporting Act; Occupational Safety and Health Act and any applicable state plans; Age Discrimination in Employment Act; Worker Adjustment and Retraining Notification Act; the Pregnancy Discrimination Act; 42 U.S.C. § 1395y(b)(3)(A) et seq.; the Arizona Civil Rights Act; the Arizona Employment Protection Act; the Arizona Equal Pay Act; the Arizona Medical Marijuana Act; Arizona Wage Statutes; and the Arizona Fair Wages and Healthy Families Act.

6.    **Exceptions**. Nothing in this Agreement is intended to waive claims (i) for unemployment benefits, (ii) for workers compensation benefits, (iii) that may arise after Johnson signs this Agreement, or (iv) which cannot be released by private agreement. In addition, nothing in this Agreement, prevents Johnson from filing a charge or complaint with, or from participating in, an investigation or proceeding (including providing documents or other information) conducted by the Equal Employment Opportunity Commission, the Securities and Exchange Commission, the Occupational Safety and Health Administration, or any other federal, state or local agency charged with the enforcement of any laws. By signing this Agreement, however, Johnson is waiving rights to individual relief (including any back pay, front pay, reinstatement or other legal or equitable relief), in any charge, complaint, lawsuit or other proceeding brought by Johnson or on Johnson's behalf by any third-party, except for any right Johnson may have to receive an award from a government agency (and not the Company) for information provided to the government agency or where such a waiver of individual relief is prohibited.

7.    **Confidentiality, Nondisclosure, Return of Company Property, and Non-Disparagement.**

a.    <u>Confidentiality</u>:  Johnson agrees to keep this Agreement and its terms and all discussions leading up to this Agreement confidential except as otherwise required by law. Specifically, Johnson agrees not to initiate or participate in any discussion or communication concerning or relating to this Agreement or any of its terms other than Johnson may discuss the terms of this Agreement with Johnson's spouse, tax advisors and/or attorneys, provided that they agree to maintain the confidentiality of the information disclosed.

b.    <u>Nondisclosure</u>:  Johnson agrees to maintain the confidentiality of all of the Released Parties' privileged, trade secret, proprietary or confidential information.

# EXHIBIT B
## [ANNOTATED]

1    I, Paras Shah, declare under penalty of perjury as follows:

2    1.    I am a resident of the State of Illinois, over eighteen years of age, and

3    employed by Plaintiff Early Warning Services, LLC ("EWS") as its Senior

4    Intellectual Property Counsel. The statements made in this Declaration are true and

5    based on my personal knowledge and the business records that EWS maintains as part

6    of the ordinary course of its business.

7    **A.    EWS's Intellectual Property Indices**

8    2.    Specific members of the Intellectual Property team in EWS's legal

9    department maintain indices containing detailed information about ongoing legal

10   matters and business initiatives involving EWS's intellectual property, including its

11   patents, trademarks, and domain names. Among my job duties as EWS's Senior

12   Intellectual Property Counsel is populating these indices with EWS's data and

13   maintaining them to ensure they remain accurate and current. This enables EWS's

14   legal department to track the development, harvesting, acquisition, and enforcement

15   of EWS's intellectual property rights.

16   3.    When Defendant Warren Vurl Johnson ("Johnson") was employed as

17   EWS's Senior Intellectual Property Counsel, his job duties also included populating

18   the indices with EWS's data and maintaining the accuracy and currency of those

19   indices.

20   4.    While some of the data in EWS's indices is publicly accessible, such as

21   patent or trademark application numbers and filing dates, much of the data in those

22   indices is privileged, proprietary to EWS, highly confidential, and valuable precisely

23   because EWS maintains its secrecy.

24   5.    For example, EWS's Concept Brief Index and Invention Disclosure

25   Index track titles of inventions and notes, among other data. Working titles of

26   unpublished inventions often contain technical detail that can disclose aspects of the

27   underlying inventions to those familiar with the subject matter. The notes in EWS's

28   indices often reflect the details of consultations between EWS's attorneys and

1  inventors, as well as legal advice about which components of inventions would be
2  considered patentable. The same was true as of Johnson's termination from EWS's
3  employment. In fact, Johnson's initials ("WVJ") still appear in many of the notes
4  fields in EWS's indices alongside information about Johnson's consultations with
5  inventors and Johnson's advice about how best to protect those inventions.

6      6.      As part of his job duties as EWS's Intellectual Property Counsel and
7  Senior Intellectual Property Counsel, Johnson regularly gave EWS legal advice on
8  how to protect its inventions—whether by filing patent applications or by maintaining
9  the concept briefs and invention disclosures as trade secrets indefinitely. Obtaining a
10 patent allows EWS to secure exclusive patent rights for a limited time, while
11 maintaining an invention as a trade secret allows EWS to secure exclusivity for so
12 long as the invention remains secret.

13     7.      Regardless of how EWS protects its inventions and other intellectual
14 property, those assets give EWS a competitive advantage in the competitive financial
15 services field. Maintaining the secrecy of EWS's indices is essential to EWS's ability
16 to maintain certain of its inventions and other intellectual property as trade secrets and
17 preserve its position in the financial services industry. This secrecy, in turn, enables
18 EWS to effectively develop, harvest, acquire, and enforce its intellectual property
19 rights.

20     8.      Knowing this, EWS makes reasonable efforts to maintain the secrecy of
21 its indices (and other privileged, confidential, and sensitive information). One way in
22 which EWS accomplishes this is to restrict full access to the indices to a select group
23 of its employees on a "need-to-know" basis and enforce those restrictions using
24 password protection. A broader group of EWS's employees may be given limited
25 access to the indices for a limited time for the purposes of disseminating various
26 statistics about the company's intellectual property portfolio, but only employees who
27 are added to the group or affirmatively provided "read-only" access can view this
28 data.

9. EWS has invested significant resources to develop, maintain, and safeguard its indices, mostly (but not exclusively) in the form of salaries paid to employees in the legal department, among others. EWS invested these resources during Johnson's employment, and continues to make these investments to this day.

**B. The Privileged Chat**

10. The Privileged Chat occurred on or about November 3, 2022, and references negotiations of a confidential contract with one of EWS's valued partners. The contract under discussion was not executed until November 17, 2022, after which the parties continued to negotiate a series of binding statements of work ("SOWs") that would detail the parties' obligations with respect to the actual work to be completed under the executed contract. The Privileged Chat contains Johnson's legal advice and feedback in response to Ms. Cheney's questions about related negotiations.

11. EWS's contract negotiations with partners and vendors and its internal deliberations about terms are highly confidential and sensitive. EWS's competitors could undermine EWS's position in future negotiations if they had access to this information.

**C. Johnson's Acts of Misappropriation**

12. When EWS terminated Johnson, it knew Johnson had emailed some of EWS's documents to his personal email account, but EWS is still discovering which documents Johnson took, and EWS has no way of knowing which he still possesses.

13. Johnson knew he did not have EWS's authorization to email EWS's indices and other documents to his personal email address. Johnson reviewed and approved EWS's Intellectual Property Policy on multiple occasions (including, without limitation, on November 21, 2014, October 15, 2015, October 10, 2016, and September 19, 2017). As of September 19, 2017, this Policy required EWS's employees, *inter alia*, to "protect Company IP, in addition to the intellectual property of . . . third parties, against deliberate, unintentional, inappropriate, or unauthorized disclosure"; refrain from disclosing "[t]he Company's IP, including trade secrets, . . .

# **EXHIBIT C**

[ANNOTATED]

reasonable measures to keep that data secret. 1-SER-10–11. The District Court therefore did not err in rejecting Johnson's argument that EWS's Indices are unprotectable as a common industry practice.

> ### 4. The District Court Did Not Err in Rejecting Johnson's Argument that He Owns Trade Secrets in EWS's Indices Because He "Created" the Excel Spreadsheets Containing EWS's Data.

Finally, Johnson argues that EWS "lacks standing" to sue Defendants for misappropriating its trade secrets in the Indices because Johnson created the "Tools" before joining EWS, and Johnson therefore owns the information "EWS now claims as trade secrets."[13] Br. at 5, 29–31. According to Johnson, the "Tools" are the Excel spreadsheets containing EWS's data, "designed as universal Tools that could be used in any position, at any job, in any industry." *Id.* at 30. Johnson argues he designed the Tools "to make the data contained therein easily separable from the Tool itself." *Id.* at 14.

Again, Johnson's argument misses the point. EWS does not claim the templated Indices (i.e., the rows, columns, headings, standard

---

[13] Johnson also describes his interest in EWS's Indices using copyright language. *See* Br. at 29. There is no copyright claim in this case, nor could Johnson plausibly plead such a claim.

33

formulas, and conditional rules and formatting) are trade secrets, but claims ownership of the *information and data those spreadsheets contain*. As the holder of the trade secrets, EWS defines the scope of its trade secrets, not Johnson. *InteliClear*, 978 F.3d at 658 (collecting cases and explaining "plaintiffs 'must identify the trade secrets'" (citation omitted)).

The relevant question is whether the *contents* of EWS's Indices are trade secrets. As the District Court asked Johnson during oral argument, "So the blank index might not be trade secret, but the information in it created for Early Warning, why is that not protected?" 2-SER-156. The District Court went on to find that information in EWS's Indices *is* likely protectable as trade secrets because it comprises "a wealth of [EWS's] proprietary data vital to EWS's patent and trademark strategies." 1-SER-10–11. The "Tools" merely house and present this data.

As for Johnson's claim to own EWS's Indices because "he created and controlled" them while employed by EWS, the District Court properly found this argument "does not withstand even modest scrutiny, and thus the Court finds that Johnson's alleged creation or treatment of the Indices has no bearing on Plaintiff's success on the merits of its trade secrets claims." 1-SER-11. This is because the record includes EWS's IP

34

# EXHIBIT D

## [ANNOTATED]

**[PLAINTIFF'S ANNOTATIONS]**

## Early Warning Services
### Employee Employment

This Agreement is between the undersigned employee **Warren Johnson** ("Employee") and **Early Warning Services, LLC** and any affiliates for which Employee performs services or may perform services in the future (hereinafter individually and collectively referred to as the "Company").

In consideration of the Company's agreement to employ me and to provide me Trade Secrets and/or Confidential Information, I agree as follows:

**[FUTURE ASSIGNMENT OF INVENTIONS]**

1.     Ownership and Assignment of Intellectual Property.  By signing below, I hereby assign and agree to assign, free of any obligation whatsoever, to the Company as well as its or their successors, assigns, or nominees, my entire right, title and interest in any developments, designs, patents, inventions and improvements, trade secrets, trademarks, service marks, corporate names, domain names, copyrightable subject matter (collectively, "Intellectual Property"), or proprietary information which I have made, or may make, in whole or in part, and either solely or jointly with others, while I am employed by the Company and with the use of the time, material or facilities of the Company, and/or resulting from any tasks assigned to me or work performed by me for or on behalf of the Company.

**[PERFECTING THE FUTURE ASSIGNMENTS]**

I further agree that, without charge to Company, but at its expense, I will promptly execute and deliver all further documents, including but not limited to original applications and applications for renewal, extension or reissue of patents, trademark or service mark registrations or copyright registrations, in any country), and perform all lawful acts, as may be necessary to vest all rights, title and interest thereto in Company, its successors, assigns, or nominees.  The foregoing obligation to provide documents extends beyond any termination of my employment by Company.

**[LICENSE TO BACKGROUND INTELLECTUAL PROPERTY FROM EMPLOYEES]**

I also declare that to the best of my knowledge, I do not now own or claim any Intellectual Property or proprietary information relating to the business of the Company other than the Intellectual Property specifically identified and listed on Exhibit A to this Agreement (the "Background IP"), and to the extent any of such Intellectual Property is shown in an attachment to this Agreement, I hereby grant to Company a royalty-free, transferrable, fully paid-up, nonexclusive, unrestricted, irrevocable, world-wide license to make, use, duplicate, prepare derivative works, or disclose for any purpose whatsoever and to authorize others to do so, all Intellectual Property rights in and to the Background IP (including but not limited to writings, recordings, pictorial reproductions, drawings, computer programs, other graphic representations and works of any similar nature).

**[**MUST EXPLICITLY LISTED**]**

2.     Nondisclosure of Company Intellectual Property, Trade Secrets and Confidential Information.  I recognize and acknowledge that in the course of my employment, the Company will provide me Company Intellectual Property, Trade Secrets and Confidential Information (as defined below) belonging to the Company as well as the Company's customers, vendors or other third parties including entities with which the Company does business. "Company Intellectual Property" means any patent, copyright, Trade Secret, trademark, moral rights or other intellectual property or proprietary rights of Company or its licensors. "Trade Secrets" mean trade secrets as defined under federal and state law as amended from time to time and also includes without limitation and without regard to form:  a) any data or information that is competitively sensitive or commercially valuable and not generally known by the public; b) any scientific or technical information, design, process, procedure, formula, or improvement, computer software, object code, source code, specifications, inventions, systems information, whether or not patentable or copyrightable; or c) any data or information that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.     "Confidential Information" means any data or information and documentation, other than Trade Secrets, which is valuable to the Company, its customers, vendors or other third parties and not generally known to the public.

I agree that I will not disclose, or disseminate to any other person, organization, or entity any Confidential Information, Company Intellectual Property, or Trade Secrets.  I further agree that during my employment and after the cessation of my employment with the Company, I will not use or otherwise employ any Confidential Information, Company Intellectual Property or Trade Secrets outside the direct provision of my services to Company.  The obligations set forth herein do not apply to any Trade Secrets or Confidential Information which becomes generally known to competitors of the Company through no act or omission of me.  In addition, the obligations set forth herein shall not apply to disclosures made pursuant to the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7245, nor prohibit me from disclosing to other employees (excluding competitors and future employees) information about my compensation or my working conditions.

3.     Records.  Upon any termination of my employment or at any time the Company requests, I agree to immediately turn over to the Company all Company materials and Trade Secrets and Confidential Information, and

[PLAINTIFF'S ANNOTATIONS]

## EXHIBIT A

### BACKGROUND IP

**Insert Background IP below or note "none" here if none exists**  *NONE*  including all Intellectual Property or proprietary information that I have made, or may make, which is made or developed on my own time and using my own material, equipment and facilities, and which is not the result of or related to tasks assigned to me or work performed by me on behalf of the Company.

[***Background IP listed here is subject to the contracts licensing language: "I hereby brant to Company a royalty-free, ... license to make, use,... for any purpose whatsoever....."]

[Listing I.P. here is a condition precedent for a license grant to EWS to Background IP.]

[Entry of "NONE" is considered an explicit denial of license to EWS to Intellectual Property owned by an employee.]

# EXHIBIT E

**Registration Number**

# TXu 2-519-256

**Effective Date of Registration:**
December 30, 2025
**Registration Decision Date:**
January 13, 2026

## Title

    **Title of Work:**    Invention Disclosure Workflow Assist

## Completion/Publication

    **Year of Completion:**    2014

## Author

-     **Author:**    Warren Johnson
  **Author Created:**    computer program
  **Citizen of:**    United States
  **Domiciled in:**    United States

## Copyright Claimant

    **Copyright Claimant:**    Warren Johnson
    215 E 18th, Lawrence, KS, 66044, United States

## Limitation of copyright claim

    **Material excluded from this claim:**    User-entered data, public domain formulas, abstract functionality, and general spreadsheet layout or design elements.

    **New material included in claim:**    computer program

## Rights and Permissions

    **Name:**    Warren Johnson
    **Email:**    warrenvjohnson@gmail.com
    **Telephone:**    (208)317-1686

## Certification

    **Name:**    Warren V. Johnson

**Date**:   December 16, 2025

---

**Correspondence:**   Yes

**Registration Number**

# TXu 2-520-557

**Effective Date of Registration:**
January 09, 2026
**Registration Decision Date:**
January 20, 2026

## Title _____

**Title of Work:** Intellectual Property General Matter Management System

## Completion/Publication _____

**Year of Completion:** 2014

## Author _____

- **Author:** Warren Johnson
  **Author Created:** computer program
  **Citizen of:** United States
  **Domiciled in:** United States

## Copyright Claimant _____

**Copyright Claimant:** Warren Johnson
215 E 18th St, Lawrence, KS, 66044

## Certification _____

**Name:** Warren Johnson
**Date:** January 09, 2026

**Correspondence:** Yes

# EXHIBIT F



**Legal Services**
63 East Main Street #101
Mesa, Arizona 85201-7422

(480) 472-0208 | fax (480) 472-0489
www.mpsaz.org/legal

Kacey King
GENERAL COUNSEL

klking@mpsaz.org

April 29, 2025

To Whom It May Concern,

This letter is to formally confirm that there is no record of Warren V. Johnson's attendance at Mesa High School, and to verify that according to our records he did not attend Mesa High School between 1996-1999 or at any other point.

If you require any additional information, please feel free to contact me.

Sincerely,

Kacey King
General Counsel

# EXHIBIT G

# Template

**Template**

📎 | IP M...Template.xls | Patent ...plate.xls | Inventi...plate.xls

---

**WJ** **Warren Johnson**

To: warren.johnson@earlywarning.com <warren.johnson@earlywarning.com>

Tue 9/9/2014 7:34 PM

| 📊 IP Matter Index Template.xls<br>822 KB | 📊 Patent Index Template.xls<br>1 MB | 📊 Invention Disclosure Index Tem...<br>2 MB |

3 attachments (4 MB)   ⬇ Download all

Hello

↩ Reply | ➡ Forward