# EXHIBIT A

WARREN V. JOHNSON
warrenvjohnson@gmail.com
215 E 18th St
Lawrence, KS 66044
Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MR. WARREN V. JOHNSON<br>        Plaintiffs,<br><br>   v<br>   .<br><br>EARLY WARNING SERVICES, LLC<br>Defendants. | Case No.: 1:26-cv-00441<br><br>**[PROPOSED] SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

**[PROPOSED] SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

EWS's Reply abandons the framework of its Motion and substitutes four new factual premises, personal attacks, and case authorities. Each is refuted by the record and waived.

| EWS's New Claim (Reply) | The Record Shows | Legal Consequence |
|---|---|---|
| Johnson registered "Microsoft's source code" as his own. (Reply at 1) | Microsoft's official policy: "You may sell a spreadsheet… you made using Microsoft software." Services Agreement: "We don't claim ownership of Your Content." (Ex. B). Copyright Office classified the works as "computer program" after examining 25 pages of deposits. (SAC Ex. E). Kilpatrick Townsend's own ACC Guide states source code is "the program's most literal form of expression" and the most copyrightable element. (Ex. C at 7). | The central premise is false. No competent IP attorney would confuse user-authored Excel formulas with Microsoft's proprietary source code. *Not raised in Motion; waived. Narducci, 572 F.3d at 324.* |
| Johnson cited a "hallucinated" opinion, used a "chatbot," and "invents" quotations. (Reply at 1, 4, nn. 1–4) | *Nance v. United States*, No. 22-cv-03861 (N.D. Ill. Aug. 14, 2023) (Hunt, J.) exists and is on Google Scholar. (Ex. A). Johnson had clerical errors in the citation; the case is real. The remaining attacks involve imprecise quotation marks on accurate paraphrases of real holdings. | EWS fabricated an accusation of fabrication. A human typo is not a hallucination; declaring a case nonexistent without checking is. *Not raised in Motion; waived.* |
| "Common sense" shows Johnson's works lack creativity, like "Go Thunder" in *Syrus*. (Reply at 10–11) | All software is written in someone else's programming language. *Syrus* involved three words; Johnson's deposits are 25 pages of source code. | The comparison is self-refuting. *Syrus* and *Franklin* were *not raised in Motion; waived.* |
| Johnson "convinced" the Copyright Office to register his works "by calling these lists 'computer programs.'" (Reply at 1) | The "Author Created" and "New Material" fields show the examiner independently classified the works as "computer program." The "Limitation" field expressly excludes "public domain formulas, abstract functionality, and general spreadsheet layout." | The registration followed independent examination. *Not raised in Motion; waived.* |

## ARGUMENT

## I. The "Microsoft Source Code" Theory Is False and Contradicted by EWS's Own Counsel

EWS's new claim that Plaintiff registered "Microsoft's source code" is refuted by Microsoft's own policy and services agreement. (Ex. B). More fundamentally, no competent intellectual property attorney would confuse user-authored Excel formulas with Microsoft's proprietary source code. The two are as different as a novel and the word processor used to write it. Yet EWS's IP specialists advance this argument while their own firm's 2024 ACC Guide states that source code is "the program's most literal form of expression" and "the most likely to receive copyright protection." (Ex. C at 7). EWS cannot publicly advise corporate clients that source code is highly copyrightable, then tell this Court the opposite. This argument was not raised in the Motion and is waived.

**II. The Citation Attacks Are a Case Study in the Difference Between Human Error and Fabrication**

EWS accused Plaintiff of citing a "hallucinated" opinion. *Nance v. United States*, No. 22-cv-03861 (N.D. Ill. Aug. 14, 2023) (Hunt, J.), is a real opinion available on Google Scholar. (Ex. A). Plaintiff made a human clerical error transcribing digits—a typo. ***Humans make errors, AI hallucinates entire cases, or in some cases the lack thereof***. What EWS did is precisely what it wrongly accused Plaintiff of doing: it asserted the case did not exist without verifying it. A machine might see a non-matching string and declare it nonexistent; a lawyer checks the jurisdiction and the judge.  The remaining attacks involve imprecise quotation marks on accurate paraphrases. That EWS, with three attorneys, attacks punctuation in a pro se brief rather than the merits reveals the absence of a defense. These attacks were not raised in the Motion and are waived.

**III. EWS's Accrual Argument Contradicts Its Own Firm's Published Guidance**

EWS's Reply newly characterizes Plaintiff's infringement claim as a pure ownership dispute to trigger accrual under *Sumrall v. LeSea* in 2014. This characterization is incorrect and contradicted by Kilpatrick Townsend's own publications. The firm has acknowledged that copyright infringement claims "arise[] or 'accrue[]' when an infringing act occurs." Kilpatrick Townsend, *Supreme Court Clarifies Copyright Statute of Limitations in Warner Chappell Music v. Nealy* (May 2024). Plaintiff is suing for infringement starting in 2024—after the settlement agreement and within three years of filing. The claim is timely even based on when infringement started in 2023, and EWS's contrary position is one its own attorneys have publicly disavowed.

## IV. EWS's New Authorities Do Not Support Dismissal

*Foss v. Eastern States Exposition*, 149 F.4th 102 (1st Cir. 2025), is a First Circuit case with no binding authority here. The court expressly declined to address claim preclusion and addressed a single passive posting of a video, not functional software that creates a new reproduction each time it is used. *Syrus v. Bennett* involved three words; Plaintiff registered 25 pages of source code. Both cases were raised for the first time in the Reply and are waived. On damages, Plaintiff seeks actual damages and disgorgement under § 504(b), not statutory damages. Section 412 does not apply to actual damages. *Fourth Estate* confirms that actual damages for pre-registration infringement remain recoverable. 586 U.S. at 299.

## CONCLUSION

Plaintiff holds two valid copyright registrations for works EWS's own declarant described as "indispensable" to daily operations. EWS's Reply consists of new, waived arguments and false accusations. It should be evaluated accordingly.

Respectfully submitted,

Dated: __April 25, 2026_____

/s/ Warren V. Johnson
Warren V. Johnson
215 E 18th St
Lawrence, KS 66044
Tel: (208) 317-1686
warrenvjohnson@gmail.com

# EXHIBIT A

**Fred L. Nance, Jr., Plaintiff,**

**v.**

**United States, et al., Defendants.**

Case No. 22-cv-03861.

**United States District Court, N.D. Illinois, Eastern Division.**

August 14, 2023.

## MEMORANDUM OPINION AND ORDER

LaSHONDA A. HUNT, District Judge.

Representing himself, Plaintiff Fred L. Nance, Jr., sued the United States of America and multiple federal government agencies, officials, and employees (the "Government Defendants") under several federal statutes and for various state common law causes of action. The Government Defendants now move to dismiss Nance's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, alternatively, seek summary judgment under Federal Rule of Civil Procedure 56. For the reasons stated below, the Court grants the motion as follows—the FTCA claim is dismissed without prejudice and the remaining claims are dismissed with prejudice.

## PROCEDURAL HISTORY

Nance commenced the instant case in July 2022 by filing "Plaintiff['s] Whistleblower Complaint at Law" (hereinafter, the "Second Case"). (Compl., Dkt. No. 1). Approximately two years earlier, in October 2020, Nance had commenced a similar action, Case No. 20-cv-06316, by filing "Plaintiff's Original Complaint" (hereinafter, the "First Case") (20-cv-06316, Compl., Dkt. No. 5).[1]

## I. Comparison of the Complaints Filed in Each Case

Although there are notable differences between the complaints filed in the First Case and the Second Case, they contain many of the same allegations and claims. The Court will discuss the allegations in greater detail below, but, essentially, Nance alleges that his employer and certain government agencies, officials, and employees retaliated against him for reporting perceived fraud and misappropriation with respect to federal grant funds.

Based on these allegations, both complaints assert federal statutory claims under the National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, 126 Stat. 1632 (2013) (NDAA),[2] 41 U.S.C. § 4712, and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (FTCA), along with state common law claims for retaliation, hostile work environment, emotional distress, and special damages. In addition, each complaint contains a claim that the other does not. The complaint filed in the First Case asserted a claim for violation of the Illinois Whistleblower Act, 740 ILCS 174/1, *et seq.,* and the complaint filed in the Second Case asserts a claim under the False Claims Act, 31 U.S.C. §§ 3729-3733 (FCA).[3]

The defendants named in each complaint also vary. In the First Case, Nance sued the following defendants: the Department of Justice (DOJ); the Bureau of Justice Assistance (BJA); the Office of Justice Programs (OJP); EMAGES, Inc. (federal grant recipient/Nance's former employer and/or partner); Hattie Wash (EMAGES president/CEO); Thomas Bradley (grant accountant); Michael Dever (BJA officer/employee); Andre Bethea (OJP officer/employee); and Tracy Willis (OJP officer/employee). (20-cv-06316, Compl. at 6, Dkt. No. 5).

The complaint filed in the Second Case contains conflicting statements about the identities of the Defendants. Despite the clear mandate of Federal Rule of Civil Procedure 10(a) that "[t]he title of the complaint must name all the parties[,]"

Fed. R. Civ. P. 10(a), the caption here states that the Defendants are "United States, et al.," which suggests Nance has sued multiple defendants. (Compl. at 1, Dkt. No. 1). The section entitled "PARTIES" names all the same defendants as in the First Case, with the addition of the United States of America and the exclusion of Hattie Wash and Thomas Bradley. (*Id.* at 3). In another section, however, the complaint repeatedly clarifies that the United States is the only Defendant: "[the] FTCA claim can be brought only against the United States, not the DOJ."; "The only proper defendant in an FTCA action is the United States not DOJ."; "Plaintiff . . . now re-files his case in this Court against the United States and not DOJ . . ."; "Plaintiff is filing a complaint against the United States . . ., not the DOJ, specifically." (*Id.* at 6-7).

Notwithstanding those statements, the complaint later refers again to multiple defendants: "Plaintiff claims the United States and all defendants employed by the United States Department of Justice, Bureau of Justice Assistance, Office of Justice Programs listed in this complaint . . ." (*Id.* at 30). But then, reversing course yet again, in Nance's response brief he states that "Plaintiff's complaint is against the United States, not the Federal Defendants[,]" (Pl.'s Resp. at 2, Dkt. No. 11), "Plaintiff has brought this action naming the appropriate defendant, United States[,]" (*Id.* at 3), and "Plaintiff is suing the United States" (*Id.* at 5). Finally, in closing, Nance changes his stance one more time by stating: "For the foregoing reasons, this court should not dismiss plaintiff's claims against the United States and federal employees. . .[.]" (*Id.* at 15).

Construing his *pro se* pleadings liberally as the Court must, it appears that Nance intended to name either (a) the United States as the only defendant for the FTCA claim and the United States and other federal government agencies and employees as defendants for other claims, or (b) the United States as the only defendant and references to other defendants are the result of confusion or an unintentional carrying over from the complaint in the First Case. In any event, it is unclear exactly which claims Nance is asserting against particular Defendants. These concerns are ultimately immaterial, however, because the instant complaint must be dismissed regardless of whether the United States is the only defendant.

## II. Relevant Orders and Filings

In the First Case, previously assigned District Judge Alonso[4] dismissed the FTCA claim against the Government Defendants without prejudice (and without leave to amend) because Nance did not exhaust administrative remedies before filing the case.[5] (20-cv-06316, Mem. Op. & Order at 12, Dkt. No. 64). The remaining federal statutory claims and state common law claims against the Government Defendants were all dismissed with prejudice because "an entity cannot be liable on those claims unless it was plaintiff's employer" and Nance "admitted in open court that he was not an employee of the Department of Justice." (*Id.* at 13).[6]

Nance subsequently filed several motions in the First Case aimed at restoring the FTCA claim. Judge Alonso denied Nance's request to stay proceedings while he sought to exhaust administrative remedies, stating that "[a] suit filed before a plaintiff exhausts [administrative remedies] must be dismissed, even if the plaintiff exhausts after filing suit. Accordingly, this case is over with respect to the government defendants." (20-cv-06316, Order at 1, Dkt. No. 68).[7] Next, after having allegedly exhausted his administrative remedies, Nance filed motions seeking to reinstate the FTCA claim or re-assert it in an amended complaint, which Judge Alonso likewise denied. (20-cv-06316, Pl.'s Mots., Dkt. Nos. 110, 116, 123). Judge Alonso explained to Nance once more that "Plaintiff simply cannot add an FTCA claim to this case" and further warned him that "[f]uture attempts to reopen the judgment as to the FTCA claim or otherwise to add a claim under the FTCA to this case may be met with sanctions." (20-cv-06316, Order at 2, Dkt. No. 123). Finally, Nance commenced the Second Case against the Government Defendants raising the FTCA claim, but also adding the employment-based claims (which had previously been dismissed with prejudice in the First Case upon his admission that he was not a government employee), along with a new claim under the FCA.

## BACKGROUND

In support of his claims in the Second Case, Nance realleged many facts contained in the complaint in the First Case concerning the history of the subject grant, the perceived fraud and misappropriation with respect to grant funds by Wash, the supposedly pretextual termination of the grant, and his belief that he was retaliated against by Wash,

EMAGES, and the Government Defendants for reporting these events. (Compl. ¶¶ 1-98, Dkt. No. 1). The Court will presume familiarity with those details and not restate them here. However, the complaint in the Second Case does allege several new, relevant facts that warrant discussion.

After the EMAGES grant was terminated at Wash's request, Nance, through his organization, C.L.I.C.K. Services, NFP, attempted to apply for a Second Chance Act Community-Based Reentry Fiscal Year 2021 grant. (*Id.* ¶ 101). Nance missed the application submission deadline, and his application was rejected due to technical glitches/difficulties. (*Id.* ¶¶ 101-106). Nance's appeal of the rejection was initially denied, but upon further consideration he was ultimately offered additional time to submit/complete his application. (*Id.* ¶¶ 107-101). The complaint does not state whether Nance acted upon this offer or eventually received a grant.

In addition, Nance attempted to participate in the Fiscal Year 2021 Second Chance Act Community-Based Reentry Program peer review program, but he did not receive an assignment when expected. (*Id.* ¶¶ 111-17). In response to various communications Nance sent concerning the peer review, he received the following statement: "As there are fewer applications going forward to peer review than initially anticipated, we will not need to utilize the total number of peer reviewers initially invited to participate." (*Id.* ¶ 118). After Nance requested clarification, he received the following reply: "You are not eligible to serve on this peer review panel. Peer reviewers must comply with BJA's conflict of interest rules and regulations. A peer reviewer cannot have a financial relationship with an organization that submitted an application under the solicitation being peer reviewed. Thank you for your interest." (*Id.* ¶¶ 119-20). According to Nance, "[that] decision has DOJ, BJA, OJP Bethea's fingerprints all over it. Bethea is retaliating against [Nance] due to this litigation." (*Id.* ¶ 123).

Nance had also refiled his so-called whistleblower complaint with the DOJ after Judge Alonso determined that he had failed to properly exhaust administrative remedies with respect to the FTCA claim. (*Id.* at 5). The DOJ denied Nance's claim in a letter dated April 28, 2022, which stated as follows:

> We have reviewed the administrative tort claim you submitted to the U.S. Department of Justice dated June 9, 2021, relative to the alleged acts or omissions of employees of the Office of Justice Programs, the Bureau of Justice Assistance, and the U.S. Department of Justice occurring from April 2020 to November 2021. After careful consideration, it has been determined that your claim is not compensable. Accordingly, your claim must be and hereby is denied.

> I am required by law (28 C.F.R. § 14.9(a)) to inform you that, if you are dissatisfied with this determination, you may file suit in an appropriate United States District Court no later than six months after the date of mailing of this notification of denial. 28 U.S.C. § 2401(b).

(*Id.* Unlabeled Exhibit to Compl.).

The complaint strings together these allegations to generally claim that the Government Defendants caused the termination of Nance's employment, failed to sufficiently investigate Nance's claims about wrongful conduct in connection with the grant funds, failed to restore his employment, and conspired, colluded, and collaborated with EMAGES and Wash to accept the request to terminate the grant under the pretext of pandemic-related difficulties in retaliation against Nance for whistleblowing. (*Id.* at 30-31). For having suffered all these purported wrongs, Nance requests: (1) $500,000 in damages; (2) approval of a $750,000 grant for his organization; (3) reprimand of the involved government employees; and (4) letters of support or apology exonerating him from wrongdoing. (*Id.* at 36).

In response to Nance's complaint in the Second Case, the Government Defendants filed the motion that is now before the Court, seeking dismissal or, alternatively, summary judgment, on all claims. According to the Government Defendants, the FTCA claim should now be dismissed because there is no analogous tort liability against the government as a "private individual under like circumstances[,]" which is required under 28 U.S.C. § 2674. (Defs.' Mem. at 5-10, Dkt. No. 7). Furthermore, the Government Defendants argue that the FCA claim is subject to dismissal because the government cannot be sued under the statute, Nance failed to comply with several filing requirements, and such a claim cannot be pursued without counsel. (*Id.* at 10-11). As to the remaining employment-based claims, the Government Defendants assert that the final judgment in the First Case precludes Nance from bringing them again here, and, in any event, they suffer from the same underlying defects (i.e., that the Government Defendants were not Nance's employer). (*Id.* at 11-14).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal based on a "lack of subject-matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1); *see also Laborers' Pension Fund v. Midwest Milling & Paving Co., Inc.,* No. 20-cv-00908, 2021 WL 292849, at *2 (N.D. Ill. Jan. 28, 2021). Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal based on the opposing party's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Faced with a Rule 12(b)(6) dismissal motion, courts must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007). In addition, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 322 (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)). The movant has the burden to show entitlement to dismissal. *Marcure v. Lynn,* 992 F.3d 625, 631 (7th Cir. 2021).

Federal Rule of Civil Procedure 56(a) requires summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## DISCUSSION

## I. Federal Tort Claims Act (Count III)

Nance's FTCA claim was properly dismissed in the First Case because he had not exhausted his administrative remedies. After the DOJ denied his administrative tort claim based on the same underlying allegations, Nance filed the complaint in the Second Case reasserting his FTCA claim. With the question of exhaustion settled, the Government Defendants now move to dismiss the FTCA claim because there is no analogous tort liability against the government "as a private individual under like circumstances," as required under 28 U.S.C. § 2674.

The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort." *Levin v. United States,* 568 U.S. 503, 506 (2013) (quoting *Richards v. United States,* 369 U.S. 1, 6 (1962)). The applicable statute imposes liability on the United States for tort claims "in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. Subject to certain express exceptions, the jurisdictional statute grants district courts exclusive jurisdiction over "claims against the United States . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1). One such exception excludes "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 2680(h). "In FTCA cases, state law applies to substantive questions and federal rules govern procedural matters." *Gil v. Reed,* 535 F.3d 551, 558 n.2 (7th Cir. 2008).

Two paragraphs comprise the FTCA count of Nance's complaint. The first adopts the preceding 31 pages of "opening paragraphs and paragraphs 1-127" while the second recites some of the applicable statutory text. (Compl. at 32, Dkt. No. 1). A few pages earlier, in the first paragraph under "CAUSES OF ACTION", Nance appears to summarize the theory underlying his FTCA claim: "the United States . . . violated the Federal Tort Claims Act . . . [by] directly and indirectly causing the termination of plaintiff[']s employment, . . . and . . . for not sufficiently investigating plaintiff[']s claims against EMAGES, Inc., Dr. Hattie Wash and restoring plaintiffs employment." (*Id.* at 30).

The Government Defendants seek dismissal of the FTCA claim on several grounds. First, they argue that there is no tort liability for private individuals under circumstances that are analogous to accepting a request to terminate a grant award or disallowing an individual with a conflict of interest from peer reviewing grant applications. Because Nance did not articulate any specific tort(s) to serve as a basis for the FTCA claim, the Government Defendants speculated that he might have attempted to assert negligence, fraud, tortious interference with contract rights, or, perhaps, civil conspiracy.

If Nance is claiming negligence, then the Government Defendants argue that he has not and cannot allege that they (a) owed him a duty in connection with the grant termination or peer review approval process, or (b) caused him any damage, because the grant recipient requested that the grant be terminated. If Nance is claiming fraud, tortious interference with contract rights, or civil conspiracy, then the Government Defendants note that his claim must fail because such actions are expressly excluded by statute. Additionally, the Government Defendants observe that the injunctive relief and prejudgment interest requested by Nance are not recognized forms of relief under the FTCA. In response, Nance repeats the conclusory theory underlying his claim: "the United States employees acted negligently and wrongfully, which led to plaintiff being terminated for filing whistleblower complaints." (Pl.'s Resp. at 5, Dkt. No. 11). Furthermore, Nance states that he has "satisfied [the] criteria" of alleging that the DOJ employees had a duty to investigate his whistleblower complaints, that they caused his termination by the grantee, and that these issues constitute disputes of material fact that should preclude dismissal or summary judgment. (*Id.* at 5-9).

The Court agrees that the complaint, as alleged, does not identify any tort or contain facts supporting the elements of a tort that would give rise to a claim under the FTCA. First, it is problematic that the complaint does not articulate the tort claim upon which Nance's FTCA claim is based. If alleging negligence, Nance has failed to allege facts in support of a duty owed to him by the Government Defendants. *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,* 593 F.3d 507, 514 (7th Cir. 2010) (listing the "basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach.") (citing *Krywin v. Chi. Transit Auth.,* 391 Ill. App. 3d 663 (2009)). Although his response states that "the United States employees acted negligently" and had a duty to investigate his whistleblower complaints, Nance cited no legal authority in support of such a duty under the circumstances alleged in the complaint. Without the detail evincing a plausible claim, the FTCA count must be dismissed because either there is no analogous tort liability or the complaint, as alleged, fails to state a claim for negligence. Similarly, Nance has failed to sufficiently allege facts that would support causation.

If Nance intended to allege any of the other intentional torts identified by the Government Defendants, then he has pled himself out of court, as they are all excluded from the FTCA under 28 U.S.C. § 2680(h). Because the complaint is undeveloped as to the legal theory underlying Nance's FTCA claim and Nance is proceeding *pro se,* the Court hesitates to reach such a determination at this juncture of the case. Nonetheless, the Court cautions Nance that some of the allegations of the complaint appear to be of the type that would support certain claims such as misrepresentation, deceit, or interference that are excluded from the FTCA. (*See, e.g.,* Compl. at 30 & ¶ 123, Dkt. No. 1 ("The United States employees actively conspired, colluded, and/or work collaboratively with EMAGES, Inc. and Dr. Hattie Wash . . ." & "This decision [(i.e., denial of peer review application)] has DOJ, BJA, OJP Bethea's fingerprints all over it. Bethea is retaliating against plaintiff due to this litigation."). These are the type of allegations that would give rise to intentional tort claims that are barred under the statute. For these reasons, the FTCA claim is dismissed without prejudice.[8]

## II. False Claims Act (Count IV)

The Government Defendants provided a host of reasons for dismissal of Nance's FCA claim. In response, Nance offered to file an amended complaint under seal but did not address to any of the identified issues. Because FCA claims must adhere to certain statutory requirements and cannot be filed against the federal government or by an individual without an attorney, Nance cannot proceed on the FCA claim here.

It is well-established that an FCA claim may not be filed by an individual who is not an attorney or represented by an attorney. *See Georgakis v. Illinois State Univ.,* 722 F.3d 1075, 1077 (7th Cir. 2013); *United States ex rel. Szymczak v. Covenant Healthcare Sys., Inc.,* 207 F. App'x 731, 732 (7th Cir. 2006); *United States ex rel. Lu v. Ou,* 368 F.3d 773, 775-76 (7th Cir. 2004), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York,* 556 U.S. 928, 931 n. 1 (2009); *see also* 28 U.S.C. § 1654. Nance is not an attorney, and he is not represented by an attorney. For this reason alone, Nance's FCA claim must be dismissed.

In addition, Nance's FCA claim does not comply with several statutory requirements. Under 31 U.S.C. § 3730(b)(1), a person may bring a civil action under 31 U.S.C. § 3729 for the person and United States, and the action must be brought in the government's name. Contrary to the statutory framework, Nance did not file his FCA claim in the government's name. Furthermore, 31 U.S.C. § 3730(b)(2) specifies the method of service of the complaint and other required disclosures upon the government, provides that the complaint must be filed and remain under seal for at least

60 days, and allows the government an opportunity to intervene. Nance's failure to comply with any of those requirements also mandates dismissal.

Finally, it is fundamental that the FCA allows a person to file suit on behalf of the federal government—not against it. Yet Nance appears to be suing the federal government.[9] The statute provides that "any person" who presents false or fraudulent claims to the federal government is liable for certain penalties and damages. 31 U.S.C. § 3729(a)(1). In turn, a "person" is allowed to "bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C.A. § 3730(b). There is a "longstanding interpretive presumption that `person' does not include the sovereign." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 780 (2000) (citing *United States v. Mine Workers,* 330 U.S. 258, 275 (1947)). Furthermore, the statutory definition of "person" generally does not expressly include the federal government. 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words `person' and `whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals[.]"). Here, context, statutory text, and longstanding precedent all cause the Court to conclude that an FCA claim cannot be brought *against* the federal government. For this reason too, Nance's FCA claim must be dismissed with prejudice.

## III. Remaining Claims (Counts I, II, V-VII, and the "Retaliation" Count)

Last, the Government Defendants seek dismissal of the remaining claims (violation of the 2013 NDAA, violation of 41 U.S.C. § 4712, retaliation, hostile work environment, emotional distress, and special damages) because Nance is precluded from pursuing the claims again here and for the same reason that they were dismissed with prejudice in the First Case. The Court agrees that Nance would be barred from relitigating those claims, except to the extent that Nance's claims in the Second Case are based on acts of alleged retaliation that occurred *after* the filing of the complaint in the First Case. That distinction is immaterial, though, because the claims are subject to dismissal with prejudice for the same reason as in the first case—Nance concedes that he was not employed by the Government Defendants.

## A. Claim Preclusion

Under the doctrine of claim preclusion, also known as *res judicata,* parties are barred from relitigating causes of action for which a final judgment on the merits has already been entered. *Montana v. United States,* 440 U.S. 147, 153 (1979). Precluding litigants from bringing such claims "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153-54. Where the original judgment was entered in federal court, the federal rules of claim preclusion apply to the subsequent claims. *Ross ex rel. Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211 ("Ross II"),* 486 F.3d 279, 283 (7th Cir. 2007). Under federal law, claim preclusion applies if (1) the claims are identical, (2) the parties or their privities are identical; and (3) there has been a final judgment on the merits. *Bell v. Taylor,* 827 F.3d 699, 706 (7th Cir. 2016).

The second and third requirements are beyond dispute with respect to Nance's remaining claims.[10] Nance is the plaintiff in both the First Case and the Second Case. The United States and the federal agencies and employees named as defendants are in privity and therefore considered to be identical for purposes of claim preclusion. *Tice v. Am. Airlines, Inc.,* 162 F.3d 966, 971 (7th Cir. 1998) (defining "privity" as "a descriptive term for designating those with a sufficiently close identity of interests.") (citation omitted); *Mandarino v. Pollard,* 718 F.2d 845, 850 (7th Cir. 1983) ("A government and its officers are in privity for purposes of res judicata.") (collecting cases). The orders dismissing Nance's non-FTCA claims with prejudice in the First Case, (20-cv-06316, Mem. Op. & Order & Judgment, Dkt. Nos. 64 & 97), constitute a final judgment on the merits for purposes of claim preclusion. *See Phillips v. Shannon,* 445 F.2d 460, 462 (7th Cir. 1971) (citing an "overwhelming weight of authority" that holds dismissal with prejudice constitutes to be a final judgment on the merits). Accordingly, the requirements that the parties or their privities be identical and that there be a final judgment on the merits are satisfied.

The Court is not convinced, however, that the first requirement for claim preclusion has been fully met. To determine if claims are identical, courts ask "whether the claims arise out of the same set of operative facts or the same transaction." *Bernstein v. Bankert,* 733 F.3d 190, 226-27 (7th Cir. 2013) (quoting *Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago,*

649 F.3d 539, 547 (7th Cir. 2011)). Because "there is no formalistic test for determining whether suits arise out of the same transaction or occurrence[,]" *Ross II,* 486 F.3d at 284, courts "should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." *Id.* (quoting *Burlington N.R. Co. v. Strong,* 907 F.2d 707, 711 (7th Cir. 1990)). Claim preclusion "operates not only as a bar to the further litigation of matters decided in the prior action, but also to any issues which could have been raised." *Roboserve, Inc. v. Kato Kagaku Co.,* 121 F.3d 1027, 1034 (7th Cir. 1997) (quoting *Golden v. Barenborg,* 53 F.3d 866, 869-70 (7th Cir. 1995)). The application of claim preclusion is generally limited to issues that arose before the original complaint was filed. *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 652 (7th Cir. 2011); *Smith v. Potter,* 513 F.3d 781, 783 (7th Cir. 2008) (collecting cases); *Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 914-15 (7th Cir.1993) ("[P]laintiffs need not amend filings to included issues that arose after the original suit is lodged.").

The Court does not doubt that there is an identity of claims arising from allegations of events that took place *before* the complaint in the first case was filed on October 23, 2020. At issue here is whether Nance is precluded from bringing claims arising from new allegations of retaliation occurring *after* the filing of the first complaint. Specifically, in the complaint filed in the Second Case, Nance alleges that the Government Defendants engaged in continuing retaliation against him from April-June 2021 in connection with the 2021 fiscal year grant application and peer review process. (Compl. ¶¶ 100-25, Dkt. No. 1). The Government Defendants acknowledge the additional allegations but maintain that "[e]ven with these additional allegations, his new complaint arises out of the same transaction or event as his prior complaint—the termination of the [grant] award in alleged retaliation for his (dismissed) whistleblower complaints." (Defs.' Mem. at 12, Dkt. No. 7). To support their position, the Government Defendants quote *Ross II*: "The fact that the suits differ in some respects, including the legal theories that [the plaintiff] is advancing and some of the facts she intends to use to prove her right to relief, is not enough to defeat a finding that these cases rely on the same fundamental transaction or series of transactions." 486 F.3d at 283. In reaching that conclusion, the Seventh Circuit noted that "the time at which claim identity must be assessed is at the outset of a lawsuit." *Id.* at 283-84. Thus, the claims in the latter suit were precluded because they arose from facts that occurred before the filing of the earlier suit. *Id.*

In contrast, although most of Nance's allegations here concern events that took place before he filed the first complaint, the allegations noted above regarding alleged retaliation in connection with the 2021 fiscal year grant application and peer review process had not yet occurred and were therefore incapable of being raised in the first complaint. Accordingly, to the extent that the remaining claims are based on allegations of retaliatory conduct that occurred after October 23, 2020, they are not barred under the doctrine of claim preclusion.

## B. Failure to State a Claim

Nonetheless, the remainder of Nance's claims will be dismissed for the same reason they were dismissed in the First Case. To be liable for such claims, the Government Defendants must have been Nance's employer. That is not the case, as Nance has repeatedly admitted. (*See* 20-cv-06316, Mem. Op. & Order at 13, Dkt. No. 64 ("plaintiff admitted in open court that he was not an employee of the Department of Justice"); *see also* Pl.'s Resp. at 3, Dkt. No. 11 ("Plaintiff admits he was not a government employee[.]")). Accordingly, the remaining claims, even to the extent that they are based on alleged events that took place after the filing of the original complaint in the First Case, must be dismissed with prejudice.

## IV. Other Matters

The parties' filings contain several other requests that the Court must address. Nance's request to amend or supplement his complaint to file the FCA claim under seal, (Pl.'s Resp. at 9, Dkt. No. 11), Nance's motion to defer ruling and allow discovery, (Dkt. No. 11-4), and the Government Defendants' request to consolidate, (Defs.' Mem. at 1 n. 1, Dkt. No. 7), are all denied as moot because Nance's claims have all been dismissed (and the FCA claim has been dismissed with prejudice). The Government Defendants' request to consolidate may be renewed if Nance successfully repleads the FTCA claim. In addition, the Court strikes Nance's second memorandum of law, (Dkt. No. 11-3), because it exceeds the page limit under Local Rule 7.1 (Nance's first memorandum of law (Dkt. No. 11) is 15 pages) and was filed without permission.

## CONCLUSION

For the reasons set forth above, the Government Defendants' motion to dismiss is granted without prejudice as to the FTCA claim and with prejudice as to the remaining claims. If Nance is capable of realleging the FTCA claim consistent with this order and Federal Rule of Civil Procedure 11(b), he may do so by filing an amended complaint by September 11, 2023. If no amended complaint is filed by that date, the case will be terminated without further notice.

ENTERED.

[1] Nance filed two apparently identical complaints in the First Case at Dkt. Nos. 1 and 5. For purposes of this decision, the Court will treat the later-filed complaint as the operative pleading.

[2] Section 828 of the 2013 NDAA created a temporary "Pilot Program for Enhancement of Contractor Employee Whistleblower Protection". Congress eventually enacted a permanent version of the program as 41 U.S.C. § 4712.

[3] The first paragraph of the complaint in the Second Case also references 10 U.S.C. § 2409 (now § 4701), which contains whistleblower protections analogous to 41 U.S.C. § 4712 that apply to Department of Defense or National Aeronautics and Space Administration grants only, and 5 USC § 1221(e)(1), which contains whistleblower protection in connection with certain government employment activity. But Nance did not reference these provisions anywhere else in the complaint or in his opposition brief. Accordingly, to the extent that Nance intended to assert such claims, the Court dismisses them for failure to prosecute. Fed. R. Civ. P. 41(b).

[4] Both the First Case and the Second Case were reassigned to the calendar of Judge Hunt on June 2, 2023.

[5] Nance failed to include a "claim for money damages in a sum certain" in the letters he sent to certain government agencies. *See* 28 C.F.R. § 14.2(a).

[6] The First Case has proceeded on claims under the NDAA and FCA and other state law causes of action against "private defendants" EMAGES, Inc. and Wash. (20-cv-06316, Am. Compl., Dkt. No. 129).

[7] Nance filed a notice of appeal which the Seventh Circuit dismissed for lack of jurisdiction. *See Nance v. Dep't of Just.,* No. 21-2161 (7th Cir. Aug. 4, 2021).

[8] The Government Defendants also moved for summary judgment under Fed. R. Civ. P. 56. But no facts were alleged in either their Local Rule 56.1 statement or Nance's Local Rule 56.2 statement that would shed light on the grounds for Nance's FTCA claim. Therefore, Nance will be granted a final opportunity to allege a proper cause of action under the FTCA against the Government Defendants.

[9] The FCA claim does not expressly state the name of the defendant(s) against whom it is asserted. (Compl. ¶ 129, Dkt. No. 1.)

[10] Nance does generally dispute the application of claim preclusion in the section of his response entitled "Plaintiff claims are not precluded by the Prior Judgment[,]" but none of the arguments set forth in the brief raise legitimate disputes as to the parties' identities or the adjudicative value of the original judgment. Specifically, Nance made the following arguments against claim preclusion, each of which the Court dispels as set forth below: (1) the FTCA claim is not barred by the prior judgment (which is a point that no one disputes); (2) the claims have not been adjudicated against the United States (presumably because it was not named as a defendant in the First Case—addressed *infra*); (3) the 41 U.S.C. § 4712 claim was previously dismissed without prejudice (which is patently wrong) (20-cv-06316, Mem. Op. & Order at 13, Dkt. No. 64); and (4) the claims are not precluded by their prior dismissal because he has now exhausted administrative remedies (the exhaustion issue relates to the FTCA claim, not the claims the Government Defendants argue should be precluded).

Save trees - read court opinions online on Google Scholar.

# EXHIBIT B

Case: 1:26-cv-00441 Document #: 40-1 Filed: 04/25/26 Page 17 of 32 PageID #:1231

**EXHBIT B - MICROSOFT COPYRIGHTED CONTENT - PERMISSION TO SELL SPREADSHEETS**



**Maximize your points with the Microsoft Rewards extension**

Quick access to your daily points and offers

No thanks     **Add it now**



## Use of Microsoft copyrighted content

Microsoft products and services—including images, text, and software downloads (the "content")—are owned either by Microsoft Corporation or by third parties who have granted Microsoft permission to use the content. Microsoft cannot grant you permission for content that is owned by third parties. You may only copy, modify, distribute, display, license, or sell the content if you are granted explicit permission within the End-User License Agreement (EULA) or license terms that accompany the content or are provided in the following guidelines. For more information, consult your copyright attorney.

Visit the copyright FAQ or Microsoft trademarks for additional information.

## Requirements for allowed uses

For permission to be granted for any uses allowed by these guidelines, you must comply with the following four requirements:

### Use full product name

If your use includes references to a Microsoft product, you must use the full name of the product. Follow Microsoft Trademark and Brand Guidelines when referencing Microsoft Trademarks.

### Link methods

You may link to Microsoft content by using a plain text link with words such as "This way to Microsoft.com."

### No offensive use

Your use may not be obscene or pornographic, and you may not be disparaging, defamatory, or libelous to Microsoft, any of its products, or any other person or entity.

### Permitted by Microsoft

You must include the following statement: "Used with permission from Microsoft."

**Expand all** | **Collapse all**

Case: 1:26-cv-00441 Document #: 40-1 Filed: 04/25/26 Page 18 of 32 PageID #:1232

> Advertising and advertisements

> Box shots

> Donations of product

> Fonts

> Game content

> Maps

> Microsoft icons

> Microsoft logos and sounds

> Press

> Redistributing software

> Reprinting book excerpts, articles, and images

> Request to downgrade Microsoft Retail Products

> School reports and projects

> Screenshots

∨ Spreadsheets, databases, and PowerPoint decks

You may sell a spreadsheet, database, or PowerPoint deck you made using Microsoft software. The spreadsheet, database, or PowerPoint deck must be created using legitimate, licensed Microsoft software.

## EXHIBIT B - MICROSOFT COPYRIGHT USE

**EXHIBIT B MICROSOFT SERVICES AGREEMENT AND DISCLAIMTER OF "YOUR CONTENT"**

Published: **July 30, 2025**

Effective: **September 30, 2025**

### Introduction to the Microsoft Services Agreement

The Microsoft Services Agreement is an agreement between you and Microsoft (or one of its affiliates) that governs your use of Microsoft consumer online products and services (including related support).

We understand that you may have questions about the Microsoft Services Agreement. We have an FAQ page (https://www.microsoft.com/en-us/servicesagreement/faq) that provides more information, including what Microsoft products and services it covers. Whenever we make changes, we provide a summary of the most notable changes to the current Microsoft Services Agreement. We will also continue to provide a summary of the changes to the previous version, and a link to the previous version, of the Microsoft Services Agreement on the Summary of Changes (https://www.microsoft.com/en-us/servicesagreement/updates) page.

**Summary of Arbitration Provisions**

The Microsoft Services Agreement contains binding arbitration and class action waiver terms that apply to U.S. residents. You and we agree to submit disputes to a neutral arbitrator and not to sue in court in front of a judge or jury, except in small claims court. Please see Section 15 for details.

ESTIMATED READING TIME: 55 Minutes; 14268 words

## Microsoft Services Agreement

**IF YOU LIVE IN (OR YOUR PRINCIPAL PLACE OF BUSINESS IS IN) THE UNITED STATES, PLEASE READ THE BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER IN SECTION 15. IT AFFECTS HOW DISPUTES ARE RESOLVED.**

These terms ("**Terms**") cover the use of those Microsoft consumer products, websites, related support, and services listed at the end of these Terms here (https://www.microsoft.com/servicesagreement#serviceslist) (the "**Services**"). You accept these Terms by creating a Microsoft account, through your use of the Services, or by continuing to use the Services after being notified of a change to these Terms.

Your Privacy

Your Content

Code of Conduct

Using the Services & Support

Using Third-Party Apps and Services

Service Availability

Updates to the Services or Software, and Changes to These Terms

Software License

Payment Terms

Contracting Entity, Choice of Law, Jurisdiction

Warranties

Limitation of Liability

Service-Specific Terms

Xbox

Store

Microsoft Family Features

Group Messaging

Skype, Microsoft Teams, and GroupMe

Bing and MSN

Cortana

Microsoft 365 Apps and Services

Health Bots

Digital Goods

Microsoft Storage

Microsoft Cashback

Microsoft Rewards

Azure

Microsoft Soundscape

### Your Privacy

1. **Your Privacy.** Your privacy is important to us. Please read the Microsoft Privacy Statement (https://go.microsoft.com/fwlink/?LinkId=521839) ("**Privacy Statement**") as it describes the types of data we collect from you and your devices ("**Data**"), how we use your Data, and the legal base have to process your Data. The Privacy Statement also describes how Microsoft uses your content, which is your communications with others; po submitted by you to Microsoft via the Services; and the files, photos, documents, audio, digital works, livestreams and videos that you upload, st broadcast, create, generate, or share through the Services or inputs that you submit in order to generate content ("**Your Content**"). Where proc is based on consent and to the extent permitted by law, by agreeing to these Terms, you consent to Microsoft's collection, use and disclosure of Content and Data as described in the Privacy Statement. In some cases, we will provide separate notice and request your consent as referenced Privacy Statement.

### Your Content

2. **Your Content.** Many of our Services allow you to create, store or share Your Content or receive material from others. We don't claim ownersh Your Content. Your Content remains yours and you are responsible for it.

a. When you share Your Content with other people, you understand that they may be able to, on a worldwide basis, use, save, record, repro broadcast, transmit, share and display Your Content for the purpose that you made Your Content available on the Services without compen you. If you do not want others to have that ability, do not use the Services to share Your Content. You represent and warrant that for the du of these Terms, you have (and will have) all the rights necessary for Your Content that is uploaded, stored, or shared on or through the Serv and that the collection, use, and retention of Your Content will not violate any law or rights of others. Microsoft cannot be held responsible Your Content or the material others upload, store or share using the Services.

b. To the extent necessary to provide the Services to you and others, to protect you and the Services, and to improve Microsoft products an services, you grant to Microsoft a worldwide and royalty-free intellectual property license to use Your Content, for example, to make copies retain, transmit, reformat, display, and distribute via communication tools Your Content on the Services. If you publish Your Content in areas the Service where it is available broadly online without restrictions, Your Content may appear in demonstrations or materials that promote t Service. Some of the Services are supported by advertising. Controls for how Microsoft personalizes advertising are available at https:// choice.live.com (https://go.microsoft.com/fwlink/?LinkId=286759). We do not use what you say in email, chat, video calls or voice mail, or y documents, photos or other personal files, to target advertising to you. Our advertising policies are covered in detail in the Privacy Stateme

c. Microsoft provides you with the ability to access your exportable data through the Microsoft privacy dashboard (https://account.microso privacy) or the product user interface, when authenticated with your Microsoft account. This exportable data can be used to switch to third provider services. Microsoft reserves the right to restrict the export of data that may compromise the security of the services or Microsoft's intellectual property. If you are unable to export your data through these mechanisms, contact Microsoft at the address in the How to cont section (https://privacy.microsoft.com/privacystatement#mainhowtocontactusmodule) or by using our web form (https://go.microsoft.com/ fwlink/?linkid=2126612).

### Code of Conduct

Case: 1:26-cv-00441 Document #: 40-1 Filed: 04/25/26 Page 20 of 32 PageID #:1234

**EXHIBIT B - GENERAL Q&A OFFICIAL <MICROSOFT.COM> SUBPAGE**

⋮

# Obtaining copyright for spreadsheet

 **Anonymous**                                   Mar 10, 2012, 10:31 AM

If I develop an Excel spreadsheet using VBA programming, am I allowed to copyright the spreadsheet? Sell the spreadsheet?

Microsoft 365 and Office | Excel | For home | Windows

🔒 Locked Question. This question was migrated from the Microsoft Support Community. You can vote on whether it's helpful, but you can't add comments or replies or follow the question.

💬 **0 comments**      ⚑ **Report a concern**                    ⚏ **I have the same question (300+)**

✓ **Answer accepted by question author**

 **Anonymous**                                  Mar 10, 2012, 11:06 AM

Yes, you can copyright your work and sell or distribute it as you see fit without permission and/or royalties to Microsoft. You can't sell Excel itself, but you can sell any workbook or add-in created with Excel. Copyright protection begins from the moment the work is put into tangible form, which for a workbook (or any computer software or document) would be simply saving the file to disc. You don't need to register the workbook for copyright protection, but it is wise to do so as it gives you more rights of recovery for plagarism than an unregistered work.

Was this answer helpful?   👍 Yes    👎 No

You and 100+ other people found this answer helpful.

 💬 0 comments      ⚑ Report a concern

ACC Guide℠

# Data & Software:
## Intellectual Property, Risk Management, and Asset Protection

*Sponsored by:*



**Kilpatrick**

ACC Association of Corporate Counsel
By in-house counsel, For in-house counsel®

*acc.com*

2 | Data and Software: Risk Management and Asset Protection

# Data & Software: Intellectual Property, Risk Management, and Asset Protection

March 2024

Provided by the Association of Corporate Counsel
1001 G Street NW Suite 1001
Washington, DC 20001 USA
tel +1 2020.293.410
fax +1 202.293.4107
www.acc.com

This ACC Guide[SM] is intended to assist in-house and outside counsel in spotting issues and addressing concerns that arise in connection with data and software protection. This guide provides an overview of some of the protection frameworks for data and software. It also provides guidance in navigating the legal requirements your company might face in protecting and using data and software.

This material was developed by Kilpatrick Townsend & Stockton LLP. For more information about Kilpatrick Townsend, please visit www.ktslaw.com or see the "About the Authors" section of this document.

Owing to the breadth and complexity of these topics, this ACC Guide[SM] provides an illustrative, not exhaustive, treatment of the above issues. The information in this guide should not be construed as legal advice or legal opinion on specific facts, and should not be considered representative of the views of Kilpatrick Townsend & Stockton LLP or the Association of Corporate Counsel ("ACC") or any of its lawyers, unless so stated. This guide is not intended as a definitive statement on the subject, but rather to serve as a resource providing practical information to the reader.

Copyright © 2024 Association of Corporate Counsel

3 | Data and Software: Risk Management and Asset Protection

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................... 5

II.     DATA AND SOFTWARE COPYRIGHT ISSUES .......................................................... 5

        A.      Eligibility of Data for Copyright Protection .................................................. 6

        B.      Eligibility of Software for Copyright Protection ............................................ 6

        C.      Limitations on Protecting Data and Software by Copyright ........................... 7

                i.      Derivative Works ............................................................................. 8

                ii.     Facts and Ideas ................................................................................. 8

                iii.    Data Compilations ............................................................................ 9

                iv.     Fair Use Defense .............................................................................. 9

        D.      Summary of the Digital Millennium Copyright Act ("DMCA") ................... 10

        E.      *Sui Generis* Database Protection in Europe ................................................. 12

        F.      Additional Thoughts on Protecting Data and Software by Copyright ........... 13

III.    DATA AND SOFTWARE PATENT ISSUES .............................................................. 14

        A.      Patent Eligibility Considerations for Data and Software .............................. 14

                i.      U.S. Supreme Court Test for Patent Eligibility ............................... 15

                ii.     Application of *Alice* Test by Lower Courts ..................................... 17

                iii.    Application of *Alice* Test by the U.S. Patent & Trademark Office ... 20

                        a)      USPTO Guidelines ................................................................ 20

                        b)      Recent Decisions from the Patent Trial and Appeal Board ........ 23

        B.      Design Patent Considerations for Data and Software .................................... 25

                i.      Differences between Design Patent Protection and Utility Patent
                Protection ................................................................................................. 25

                ii.     Protection of Data and Software by Design Patents ......................... 26

                iii.    Examples of Design Patents ............................................................ 27

        C.      Additional Thoughts on Patent Issues for Data and Software ........................ 28

IV.     DATA AND SOFTWARE PROTECTION BY TRADE SECRETS .................................. 29

        A.      Summary of Defend Trade Secrets Act ("DTSA") and State Approaches to Trade
        Secrets…... .......................................................................................................... 30

                i.      Information Has Present and Independent Economic Value ............... 30

                ii.     Information Cannot be Generally Known ......................................... 31

                iii.    Reasonable Measures Used to Maintain Secrecy .............................. 32

                        a)      Examples of Measures Found Reasonable by Courts .................. 32

                        b)      Examples of Measures Found Inadequate by Courts ................. 33

Copyright © 2024 Association of Corporate Counsel

4 | Data and Software: Risk Management and Asset Protection

|  |  | c) | Practical Considerations in Establishing Reasonable Measures to Protect Trade Secrets | 33 |
|  | B. | Types of Data Protectable by Trade Secrets | | 34 |
|  | C. | Limitations on Protecting Data by Trade Secrets | | 34 |
|  |  | i. | Cost of Reasonable Measures may Outweigh Value of Protection | 35 |
|  |  | ii. | Challenges in Defining the Trade Secret | 35 |
|  |  | iii. | Trade Secret Protection Does Not Prevent Independent Discovery | 36 |
|  | D. | Additional Thoughts on Protecting Data and Software by Trade Secrets | | 36 |
| V. | DATA AND SOFTWARE PROTECTION BY CONTRACTS | | | 36 |
|  | A. | Applicable Contract Terms | | 37 |
|  |  | i. | Confidentiality | 37 |
|  |  | ii. | Licensing and Scope of Use | 39 |
|  |  | iii. | Restrictive Covenants | 41 |
|  |  | iv. | Data Ownership | 42 |
|  | B. | Limitations and Challenges to Obtaining Damages and Injunctive Relief | | 46 |
|  | C. | Additional Thoughts on Protecting Data and Software by Contracts | | 46 |
| VI. | DATA AND SOFTWARE PROTECTION BY TORTS AND COMMON LAW PRINCIPLES | | | 47 |
|  | A. | Trespass to Chattels | | 47 |
|  | B. | Conversion | | 48 |
|  | C. | Unfair Trade Practices | | 49 |
| VII. | CONCLUSION | | | 50 |
| VIII. | ABOUT THE AUTHORS | | | 51 |
| IX. | ADDITIONAL RESOURCES | | | 52 |
|  | A. | ACC Guides^SM | | 52 |
|  | B. | Articles | | 52 |
|  | C. | Checklists and Samples | | 52 |
| ENDNOTES | | | | 53 |

Copyright © 2024 Association of Corporate Counsel

5 | Data and Software: Risk Management and Asset Protection

# I.     Introduction

This ACC Guide provides an overview of issues that commonly arise in connection with the protection and risks associated with data and software in the United States, as well as touching on a potential protection regime in Europe. There are few businesses today that do not utilize data and software on a daily basis.

Customer lists, process improvement data, website usage, data about suppliers, organically developed software, employment data – the list of examples of data and software that a company may use is limitless. This guide aims to explain the legal framework for possible protection regimes. Any individual regime may be insufficient to provide a robust protection strategy, but when multiple regimes are considered and executed, more inclusive and complete protection opportunities may be achievable.

In the first section, we summarize legal principles underlying US copyright law and its applicability to the protection of data and software. The second section discusses opportunities in patents – both utility and design – as well as certain challenges that may be faced when protecting data and software by that regime. The third section summarizes opportunities in trade secrecy for protecting data and software.  The fourth section describes the possibilities under contractual terms to maintain ownership or otherwise restrict the use of data and software shared with another entity. Finally, the fifth section summarizes potential opportunities under the law of torts to prevent unauthorized acquisition or use of data.

# II.     Data and Software Copyright Issues

Copyright law can offer protection for some kinds of data and certain aspects of a computer program. Data is generally eligible for copyright protection if it includes creativity and originality, rather than merely being a list of facts. For computer programs, the literal expressions of the software (e.g., its source code and object code) are also eligible for copyright protection.

Other aspects of a computer program, such as its functional features, are ineligible for protection under copyright law but may be protectable using other intellectual property regimes. Thus, obtaining copyright protection in conjunction with other forms of intellectual property protection may offer a more fulsome scope of protection for computer programs.

The requirements for obtaining copyright protection are relatively low as compared to other forms of intellectual property. An original work of authorship becomes subject to

Copyright © 2024 Association of Corporate Counsel

6 | Data and Software: Risk Management and Asset Protection

copyright protection the moment it is created and fixed in a tangible form.[1] No additional special steps are required to obtain a copyright for an original work. But, it is commonplace for copyright owners to register their works with the United States Copyright Office to obtain a litany of benefits.

For example, a lawsuit for copyright infringement can only be brought if the work is registered.[2] Registered works may also be eligible for statutory damages and attorney's fees in a successful litigation.[3] If registration occurs within five years of the first publication of the work, it is also considered *prima facie* evidence of the validity of the copyright.[4] Companies should therefore consider registering their works to obtain these additional benefits.

The remainder of this section describes various aspects of copyright law as applied to data and software. Part (A) describes which types of data are eligible for copyright protection. Part (B) describes the eligibility of software for copyright protection. Part (C) describes limitations on using copyright protection for data and software. Part (D) provides an overview of the Digital Millennium Copyright Act and how it applies to data and software. Part (E) provides a brief introduction to copyright protection in Europe. Part (F) concludes this section and provides some brief takeaways relating to protecting data and software using copyrights.

## A.  Eligibility of Data for Copyright Protection

Various types of data are eligible for copyright protection in the United States. Some examples of protectable data can include compilations (that possess sufficient creativity), software documentation, training manuals, and digital images. A database may be protectable as a compilation, but only if the arrangement and selection of the data is sufficiently creative or original.

In contrast, the European Union provides a more bona fide copyright protection for a database under its Database Directive. The Database Directive defines a database as "a collection of independent works, data or other materials arranged in a systematic or methodical way and individually accessible by electronic or other means."[5] The Database Directive allows for copyright protection of databases which, "by reason of the selection or arrangement of their contents, constitute the author's own intellectual creation."[6] But as in the United States, the copyright protection afforded by the Database Directive does "not extend to [a database's] contents and shall be without prejudice to any rights subsisting in those contents themselves."[7]

## B.  Eligibility of Software for Copyright Protection

Some aspects of computer software are eligible for copyright protection. Different aspects of a computer program may be subject to stronger or weaker protection. Computer software

Copyright © 2024 Association of Corporate Counsel

7 | Data and Software: Risk Management and Asset Protection

can be viewed as involving six levels of declining abstraction, including:

(1) the main purpose of the computer program (most general);
(2) the program structure or architecture;
(3) modules;
(4) algorithms and data structure;
(5) source code; and
(6) object code (the most specific).[8]

The most likely copyright protection is for the most specific levels of computer structures. Courts have explained that copyright protection is warranted for "the literal elements of computer programs, i.e., their source and object codes,"[9] because the source code is the program's most literal form of expression.[10]

On the other hand, the least likely for copyright protection are the most general levels. For example, the main purpose of a computer program is generally not copyrightable, because it is itself too abstract to confer upon the owner of such a program the exclusive rights that copyright protection provides. The program's architecture or operation is also usually not copyrightable. For example, the First Circuit has held that a menu command hierarchy is "a method of operation" and is therefore uncopyrightable subject matter.[11]

Additionally, modules, algorithms, and data structures are also likely to be precluded from copyright protection.[12] Thus, companies can protect their specific coding through copyright, but may not be able to protect anything more general in the software. Other intellectual property regimes, such as patent law, may be better suited for protecting more general features.

## C.   Limitations on Protecting Data and Software by Copyright

Copyright protection is subject to certain limitations for public policy reasons. The main public policy justifications for limiting and creating exceptions to copyrights are to protect authorial interests, consumer interests, specific industry interests, and to achieve economic policy goals in balancing the interests of competing stakeholders.[13] The limitations and exceptions to copyright law are a medley of special provisions with complex policy justifications,[14] but even with these limitations, copyrights can still serve as a viable method for protecting data and software innovations.

Limitations on protecting data and software through copyright can include derivative works, facts, data compilations, and the use of a fair use defense. These issues are further addressed in sections (i)-(iv) below.

Copyright © 2024 Association of Corporate Counsel

8 | Data and Software: Risk Management and Asset Protection

## i. Derivative Works

It is fairly common for an original work to be transformed over time into other pieces of work that are distinct from, but based on, the original. These transformed pieces of work are often referred to as derivative works. In general, a "derivative work" is a work based on "one or more preexisting works" where there is some transformation or adaptation of the preexisting work(s).[15] Examples of derivative works in the context of data and software may include developing a new piece of software based on preexisting code and creating a new piece of digital art based on original artwork.

Copyright protection for an original work extends to derivative works, so that the copyright owner of the original work also has protection against unauthorized derivative works. This means that the copyright owner can bring a copyright infringement lawsuit against someone who creates a derivative work without permission. For example, an owner of a copyright on a code library can bring a copyright infringement lawsuit against someone who creates a new program using that code library.

For a derivative work to not have exposure to an infringement suit, the copyright owner of the original work must consent to the use of the copyrighted work in the creation of the derivative.[16] Since the consent may be terminated for various reasons, either by contract or by operation of law, it is important that authors of derivative works be vigilant about whether preexisting consent is still valid before creating additional derivative works.[17] This is particularly true in the context of open-source software, for which there are many different types of licenses that may apply. Certain types of licenses are more restrictive than others, so it is important to understand the license boundaries for any open-source software relied upon to develop a new program.

The new material added to a derivative work is itself also copyrightable, but only if the new material is sufficiently original and creative.[18] For example, new features added to an existing code library to produce an extended code library may be independently copyrightable, assuming the new features are sufficiently original and creative. Thus, an author of a derivative work may obtain copyright protection for the derivative work itself. This copyright protection is separate from the copyright on the original work. The elements drawn from the original work are owned, and will continue to be owned, by the author of the original work.[19]

## ii. Facts and Ideas

Certain types of information are not eligible for copyright protection. For example, facts or ideas, including "scientific, historical, biographical, and news of the day," are not copyrightable.[20] There needs to be an element of creation and originality for a work to be copyrightable, not merely the discovery or expression of an existing fact.[21] Thus, data that is merely a collection of facts is generally deemed not copyrightable. For example, training data for a machine-learning model that is simply an aggregation of publicly available book

Copyright © 2024 Association of Corporate Counsel

9 | Data and Software: Risk Management and Asset Protection

reviews may not be eligible for copyright protection. But as discussed later, if the facts are compiled and organized using some creativity, the data compilation may be protected under copyright law.

Copyright protection also does not extend to "any idea, procedure, process, system, method of operation, concept, principle, or discovery."[22] For example, a software developer cannot seek copyright protection for a particular software process but can seek copyright protection for the fixed expression of the underlying source code that may implement the software process. Protection for the software process itself may fall within the domain of patent law. Accordingly, copyright protection for a work containing facts or ideas "is limited to those aspects of the work – termed 'expression' – that display the stamp of the author's originality."[23]

### iii.    Data Compilations

Certain types of data compilations are protected under copyright law. Protection may extend to a compilation of data that are chosen in a way which creates an original work of authorship, for example through the way the data is "selected, coordinated, or arranged."[24] Similar to derivative works, a copyright of a compilation only extends to the transformative nature contributed by the author of the compilation.[25]

To be copyrightable, a compilation must have a level of creativity or artistry. While facts alone are not copyrightable, the way in which an entity organizes the facts can be copyrightable if it incorporated creativity in the selection and arrangement of the facts.[26] For example, a collection of publicly available book reviews that is organized in a novel way that makes them easier to digest by a machine-learning model during a training process may be sufficiently creative to warrant copyright protection.

The creativity needed to establish copyright protection is minimal, so the protection is limited.[27] Competing works may freely exhibit the same data, so long as the selection and arrangement of the compiled data is different.[28] Because of the ability for anyone to use the same facts, there can be many different compilations of the same facts available on the marketplace, which may reduce the value of any individual compilation.

### iv.    Fair Use Defense

One of the most important limitations on copyright law is the ability for competitors to fairly use copyrighted works without permission if they can satisfy the elements of the fair use defense. The fair use defense is codified in 17 U.S.C. § 107, which provides the following fair use factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

Copyright © 2024 Association of Corporate Counsel

10 | Data and Software: Risk Management and Asset Protection

> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.[29]

The statute is deliberately vague, and Congress did not assign relative weights to the factors to allow for a case-by-case analysis.[30] But, the Supreme Court has analyzed each of the factors and provided some additional guidance.

The first factor involves analyzing whether the use is "transformative." That is, whether the use adds new expression or meaning to the original, or whether it merely copies from the original. The first factor can weigh against fair use if the use is merely copying and is for commercial purposes.[31] For example, directly copying source code without making any substantial modifications to the source code would likely weigh against fair use.

The second factor hinges on the creativity of the copyrighted work, where computer programs have functional and expressive components and are afforded a lower degree of protection.[32] The third factor involves analyzing how much of the work is copied.[33] The smaller the portion copied, the more it may weigh in favor of fair use. However, even copying a small portion may weigh against fair use if the copied portion constitutes the heart of the work.[34]

Finally, the fourth factor involves analyzing market harm. In particular, the fourth factor involves determining the extent to which the owner's ability to profit from the original work is impacted by the use. For example, does the use serve as a replacement for the original work, which may impact demand for the original work? Courts have generally given the most weight to the fourth factor.[35] So, companies should closely consider the economic effects of their actions with respect to the original work when determining whether their activity constitutes fair use. Using a competitor's source code to develop commercial software that directly competes with the competitor's product will strongly weigh against fair use.

## D.   Summary of the Digital Millennium Copyright Act ("DMCA")

Congress enacted the Digital Millennium Copyright Act in 1998 to facilitate the development of electronic commerce in the digital age.[36] The DMCA was implemented as part of the United States' commitment to comply with two treaties passed by the World Intellectual Property Organization ("WIPO"): the WIPO Copyright Treaty ("WCT") and the WIPO Performances and Phonograms Treaty ("WPPT").[37] The DMCA is generally divided into five titles, with the first two titles being most pertinent to data and software protection. Title I of the DMCA includes § 1201, which relates to the circumvention of copyright protection systems.[38] This section is designed to provide copyright owners with greater

Copyright © 2024 Association of Corporate Counsel

11 | Data and Software: Risk Management and Asset Protection

legal protections to prevent widespread piracy and unauthorized access to their works (e.g., hacking passwords or circumventing encryption).[39] The section generally prohibits two types of activities: "circumventing a technological measure" designed to prevent unauthorized access to a copyrighted work and "trafficking" in certain circumvention technologies.[40]

Circumventing a technological measure can involve, for example, disabling a license validation function of a software application so that you can use the software application on an unauthorized device. Trafficking in circumvention technologies can involve making or selling devices or services used to circumvent a technological measure.[41] Such devices or services are prohibited if they are "primarily designed or produced for the purpose of circumventing[;] . . . ha[ve] only limited commercially significant purpose or use other than to circumvent; or [are] marketed . . . for use in circumventing."[42] The prohibitions of § 1201 are subject to several exceptions, including:[43]

- Law enforcement, intelligence, and other governmental activities;
- Nonprofit library, archive, and educational institution exception;
- Reverse engineering;
- Encryption research;
- Protection of minors;
- Personal privacy; and
- Security testing.

Title II of the DMCA includes § 152, which relates to limitations on liability relating to content made available online. Section 512 was created to shield providers of internet access and online services from secondary liability due to users posting or sharing materials that infringe copyrights.[44] Qualifying online service providers receive safe harbor from monetary liability for copyright infringement based on the actions of their users in exchange for cooperating with copyright owners to remove the infringing content and meeting certain conditions quickly.[45]

As described in § 512, the safe harbors correspond to four functional operations of a service provider:

1. Transitory digital network communications – where the provider merely acts as a data conduit, transmitting digital information from one point on a network to another at someone else's request;

2. System caching – when the provider engages in "caching" – intermediate and temporary storage of material on a system or network – of online content for purposes of improving network performance;

3. Storage of information on systems or networks at direction of users – storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, such as websites that store digital

Copyright © 2024 Association of Corporate Counsel

content that users have uploaded for public consumption or for sharing purposes; or

4. Information location tools – service providers that provide users access to websites that contain infringing material by using information location tools such as hypertext links, indexes, and directories.

To be eligible for the safe harbors, a service provider must meet two overall conditions. First, it must adopt and reasonably implement a policy of terminating the accounts of subscribers who are repeat infringers. Second, it must accommodate and not interfere with "standard technical measures." Additionally, online service providers that facilitate functional operations 2, 3, or 4 listed above, must comply with the notice-and-takedown system to qualify for the safe harbors.

## E.    *Sui Generis* Database Protection in Europe

Copyright law in Europe has undergone significant revision over the past three decades guided by policies to harmonize the laws of individual European Union ("EU") member nations and to adapt to the increasing digital focus of IP protections.[46] Driving such revisions is the overarching goal of a single European market, centered on freedoms of movement for people, goods, services, and money.[47]

In the context of copyright, EU policies seek a unifying harmony among member nations that will protect "the essential rights of authors, performers, producers and broadcasters."[48] Thus, EU copyright laws are crafted to reduce national discrepancies, guarantee a level of protection required to protect formation of and investment in creative works, and to "promote cultural diversity and bring better access for consumers and businesses to digital content and services across Europe."[49] The adjustment of laws to rapid technological developments is viewed as necessary to address legal uncertainties "for both rightsholders and users, as regards certain uses, including cross-border uses, of works and other subject matter in the digital environment."[50]

The European Union has an internal regulatory framework for copyright that also incorporates international copyright standards established by international conventions and treaties. The EU copyright framework is codified under eleven directives and two regulations, with the most recent directive passed in 2019.[51] Some of the more relevant directives include Directive 2009/24/EC (sometimes referred to as the "Computer Programs Directive"); Directive 2019/790 (sometimes referred to as the "DSM Directive"); and Directive 96/9/EC (sometimes referred to as the "Database Directive").

The Computer Programs Directive codifies copyright protection of computer programs as literary works, in alignment with the international rules established by the Berne Convention for the Protection of Literary and Artistic Works.[52] But "[i]deas and principles which underlie any element of a computer program, including those which underlie its

Copyright © 2024 Association of Corporate Counsel